The following opinion of Hon. Milo L. Bennett, which was delivered by him at the Rutland County March Term, 1858, while sitting as Chancellor at said Term, was published in pamphlet soon after it was delivered. As appears in the notes at the close of the opinion, the decision of the Chancellor was concurred in by three of the Judges of the Supreme Court, including the Chief Judge, and therefore has the authority of a Supreme Court decision. Both the decision and the opinion have been frequently cited with approbation and a desire has been expressed by several members of the profession for the publication of the opinion in a volume of Reports. For these reasons it is republished by the permission of the Chancellor, as an appendix to the present volume:

PARIS FLETCHER, *and others*, *v.* THE R. & B. RAILROAD COMPANY, Thomas Thatcher, Ellis G. Loring, Samuel Henshaw, and D. A. Smalley.

The act of 1857, p. 23, No. 16, so far as it provides for the appointment of trustees annually, in case a railroad is in the hands of trustees under a mortgage, is *held* to impair the obligations contained in the second mortgage deed of the Rutland & Burlington Railroad Company, in which deed the trusts are specified, and *the manner of perpetuating the same*, and in this respect is repugnant to that provision in the constitution of the United States which prohibits a State Legislature from passing any law to impair the obligation of a contract, and is void.

40

Fletcher et al. *v.* R. & B. R. R. Co. et al.

PETITION IN CHANCERY. The questions discussed and the facts in the case appear in the course of the opinion. That part of the second mortgage deed of the Rutland & Burlington Railroad, referred to in the opinion, providing for a perpetuation of the trust, is as follows :

" And it is further declared, provided and agreed, that in case
" either of the parties of the second part, shall die or become from
" any cause incapable of acting as such trustee, or shall remove from
" the Commonwealth of Massachusetts, the remaining party of the
" second part, shall have the right to select and appoint in writing
" some other suitable person in the lieu and stead of the person so
" dying, removing or becoming incapable, and upon such selection
" and appointment being endorsed hereon or attached hereto,
" together with the acceptance of the person so selected and ap-
" pointed, such person shall have all the right, power, property, priv-
" ileges, benefits and advantages, including the like right of selection
" and appointment, and be liable and subject to all the duties and
" responsibilities which he might or would have been entitled, liable
" or subject unto if he had been originally named herein, as one of
" the parties of the second part, and any vacancies occurring or hap-
" pening in like manner from time to time in the number of trustees,
" by death, removal or incapacity, shall be filled from time to time
" in like manner by the remaining party of the second part, and in
" case such remaining trustee shall unreasonably neglect or refuse
" to appoint a trustee in the stead of any trustee so dying, removing
" or becoming incapable, it shall be lawful for the corporation to
" apply to any court of competent jurisdiction for the appointment
" of such trustees, as well as in case said parties of the second part
" or any one appointed in the place or stead of either, shall refuse or
" decline to act as such trustee. And the parties of the second part,
" do hereby accept of the said trust, and do hereby covenant with the
" parties of the first part well and faithfully to execute and perform
" the same."

OPINION OF BENNETT, CHANCELLOR. This is a summary pro-ceeding by petition, in behalf of certain creditors, or bondholders, as they are termed, under the second mortgage, executed by the Rutland & Burlington Railroad Company, on the first day of August, 1853, which was addressed to one of the chancellors of the State ; and the necessary notices having been given under the order of a chancellor, to all parties interested, the case came on for a hearing on the 31st of July, 1858. The petition states : that this class of bondholders were secured by a mortgage of the road and other prop-

erty of the corporation, executed to trustees, for the benefit and security of the owners and holders of said bonds; and that Samuel Henshaw and Thomas Thatcher, both of Massachusetts, are the trustees who now hold and are in the possession of the mortgaged premises, under said second mortgage; and have been, for more than two years, in trust for the bondholders or creditors under the second mortgage. The petition then proceeds to state, or recite, that Henshaw and Thatcher omitted to call a meeting of the bondholders and creditors, for the security of whose claims they hold the said mortgage property in trust, in the month of December, 1857, according to the requirements of the act of that year.

It then states the calling of a meeting by the bondholders, and their action at such meeting, under the second and third sections of the statute of 1857, Acts of 1857, page 23, No. 16, and the nomination of five trustees to manage and take charge of the trust property; and the object of this Chancery proceeding is to have the nomination of the trustees by the bondholders *confirmed*, and an order or decree made, transferring the property from the old trustees to the new ones, as the Chancellor may deem necessary and just.

The first section of the act of 1857, in general terms, declares: that it shall be the duty of trustees in possession of any railroad, under a mortgage, to call a meeting of the bondholders, &c., annually, in the month of December; and at such meeting, the trustees shall submit a report of their business and proceedings according to the usual custom of railroad directors, to the stockholders.

The second section provides, that in case of the omission of the trustees to call a meeting of the bondholders, under the first section, it may be called by any five of the bondholders, or creditors holding claims under said mortgage, in the aggregate, not less than fifty thousand dollars.

The third section provides for the nomination of new trustees, at such annual meeting of the bondholders, or creditors, to be in number not less than three, nor more than five, a majority of whom shall be residents of this state; and they are to hold their office until others are appointed.

The fourth section of the act provides that the proceedings of such

meeting of the bondholders may, in a summary manner, be presented, by any party in interest, to any chancellor within whose district the road is located, either in court or at chambers, for the purpose of obtaining a decree ratifying and confirming the nomination of the new trustees, and of transferring the property from the old to the new trustees, as may be deemed necessary and just.

The fifth section enacts, that the trustees designated and confirmed under the preceding sections, and their successors, shall be a corporation, &c., with power to hold all the trust property, and run, manage and operate said road, during the continuance of the trust; and also to have power to fill all vacancies which may occur in their board.

It appears that the trustees did omit to call a meeting of the bondholders, under the provision of the first section of the act; and no question has been raised, upon the testimony, but that the meeting of the bondholders had been called, and their proceedings had, in nominating new trustees, in full accordance with the subsequent provisions of the act; and it has not been claimed, on the trial of the case, but that the new board nominated as trustees are suitable men to perform the duty.

The Rutland & Burlington Railroad Company, the trustees, Henshaw and Thatcher, and D. A. Smalley, who was a co-trustee with Thomas Thatcher under the third mortgage, have filed their answers, setting forth certain facts and reasons why the prayer of the petitioners ought not to be granted. These answers, in this summary proceeding, are not to be taken strictly as answers in chancery, where the proceedings are by bill, but are rather to be regarded as affidavits, showing grounds why the chancellor should not entertain the present proceeding.

The petitionees have put into the case, also, the first, second and third mortgages, executed by the railroad company to trustees, to secure what is called the first, second and third class of bondholders. These mortgages are by indenture *inter partes;* the trustees named having executed them as one of the parties, and having expressly accepted the trust declared in them. Also, a decree is put into the case in the court of chancery, at their September Term, 1855, in

favor of *Ellis Gray Loring, et al* v. *Rutland & Burlington Railroad Company, et al.*, founded upon the agreement of the parties. The facts contained in the answers have in no way been controverted; and they, with the other papers, will hereafter be referred to, so far as material.

In 1850, our legislature passed a general law, authorizing railroad corporations in this state to issue their notes, or bonds, for the purposes specified in the act, " *and to be secured in such manner as they may deem expedient;*" and no questions have been made, upon the hearing, as to the validity of the mortgages.

The first mortgage was executed in February, 1851, to Franklin Haven and Samuel Hooper, as trustees, specifying the trust; and also providing the manner in which the trust should be perpetuated.

The trustees named in the second mortgage are Samuel Henshaw and J. Thomas Stevenson, which contains and specifies nearly, if not quite, the same trusts which are specified in the first mortgage, and subject to the trusts in the first mortgage; and the second mortgage, also, specifies the manner in which the trust shall, under that deed be perpetuated. It appears that the legal trustees under the first mortgage are, at the present time, Ellis Gray Loring and Thomas Thatcher, both of Massachusetts; and that the trustees of the second mortgage now are Samuel Henshaw and Thomas Thatcher, Mr. Stevenson having become incapable of performing the trust. Under the third mortgage, this same Thomas Thatcher and D. A. Smalley were appointed the trustees, and they both still remain the trustees under that mortgage. It appears that on the 16th of November, 1853, a deed of surrender of the said mortgaged property was executed by the railroad company, to the trustees originally named in the second mortgage, under which they took possession of the property; and that the deeds of surrender under date of 13th of February, 1854, and of the 3d of June of the same year, were executed in affirmance of the first, some questions having been raised as to its validity. It further appears, that prior to, and at the time of the execution of the deed of surrender, on the 16th day of November, 1853, the railroad company was greatly embarrassed in their financial affairs, and continued in such situation thereafter, being entirely

unable to meet their liabilities; and that it became necessary, in order to insure the running of the road, that the company should have some substantial aid in extricating themselves from their pecu-niary embarrassments,. &c., and that, the coupons upon the second mortgage bonds being unpaid, and the trustees under that mortgage claiming to be in possession, for the purpose of facilitating an arrangement of conflicting interests in connection with the road, and of securing the adoption of measures for the protection of the same, Wm. R. Lee, who was one of the trustees under the second mort-gage, resigned his trust, and Thomas Thatcher was appointed a trustee in his place, who was also, at the same time, one of the trustees under the first mortgage, as well as under the third; and that in January, 1855, at a public meeting of the bond-holders and creditors of the first and second mortgages, a certain agree-ment was adopted, by which the trustees under the second mort-gage were to continue in possession of the property until the first of February, 1863, and perform certain trusts relative to the bond-holders and creditors under the first mortgage; and among other things, it was made the duty of the trustees under the second mort-gage to run the road in the most discreet and productive manner; and from the earnings of the road, they were at all times to keep the road and its rolling stock, &c., in thorough repair, and in constant supply; so that the entire property should be at all times in the highest state of efficiency for the advantageous transaction of busi-ness; and from the gross earnings, the trustees were to pay, in the first place, the charges and expenses of transacting the business, including all necessary and proper *purchases, renewals and repairs.*

It further appears that after this arrangement was made, the trus-tees under the second mortgage made heavy advances, and incurred large liabilities personally, which are still undischarged, for the pur-pose of carrying out the object of the trust in the most beneficial manner; relying upon the property in their hands, as trustees, as a means of their indemnity.

It seems, that upon a bill brought by the trustees under the three mortgages, against the railroad company and others, the agreement entered into between the first and second class of bondholders was

confirmed by a decree of the chancellor; but it does not become necessary, in this case, to inquire as to what must be the effect of such a decree upon the different interests involved in this road.

This petition was evidently brought under the act of 1857, (see page 23) relating to trustees of railroads; and I have no doubt that, by a fair construction of the act, it does contemplate that the application for a meeting of the bondholders might be made by the bondholders under the second mortgage, without making the bondholders under the other two mortgages a party to the proceedings. The first section says: it shall be the duty of *trustees in possession of any railroad under a mortgage deed,* to call a meeting, &c. In this case the trustees under the second mortgage were in possession, under their mortgage, and by virtue of the same. This the evidence expressly shows; and the deeds of surrender, and the joint action of the bondholders under the first and second mortgages, were by way of confirming their possession. It is not competent for the railroad company to call in question the right of the trustees under the second mortgage, to possession; and though they may owe the bondholders under the first mortgage certain duties, yet that is nothing to the railroad company. They have the title as against the railroad company; and though by the terms of the agreement they are to pay over, for the benefit of the first class of bondholders, yet this is a matter of trust. The fact that Thatcher is also one of the trustees under the first mortgage, will not alter the case. He and his associate took the possession, as trustees under the second mortgage. It may be made a question whether the first class of bondholders have not such an interest in this proceeding, growing out of the agreement between the first and second class of bondholders, entered into in January, 1855, that they should be before the court, before any decree could be made changing the trustees; but be that as it may, we are not disposed to turn this cause off upon any matter of form.

The question as to the validity of the act of 1857, may as well be met at first as at last. And it is due to the counsel in the case to say, that we do not approach the question without the aid of a very full and able argument, presenting, probably, about all that can be said on either side of it. No question will be raised but that the

indenture, or mortgage deed, from the railroad company to the trus-
tees, was a contract within the prohibition of that provision in the
constitution of the United States, which inhibits the states from
passing laws impairing the obligation of contracts. The trustees
took the legal title to hold in trust for the bondholders, as well as in
trust for the railroad company, and this title is clothed with an active
trust.

The important inquiry is, whether the act of 1857 does impair the
obligation of the contract in question. This mortgage, after reciting
the first mortgage, conveys the railroad, &c., to the trustees named
in the mortgage ; first to secure the payment of the holders of the
notes or bonds issued under this mortgage ; and when paid they are
bound to re-deed to the railroad company.

The railroad company are to have the right of possession till
breach of the condition ; and the deed then provides for an entry of
the trustees, in case the company fail to pay, &c. ; and it also pro-
vides that after such entry, the trustees shall have a reasonable com-
pensation for their services, and also clothes them with a power of
sale ; and provides for the payment of the surplus, if any there shall
be after the other trusts are discharged, to the railroad company, or
their assigns.

The deed also provides for perpetuating the trust. If either of
trustees shall die, or become from any cause incapable of acting as
such trustee, or shall remove from the Commonwealth of Massachu-
setts, the other trustee is to fill his place, who is to have all the pow-
ers of an original trustee ; and it is further provided for filling *vacan-
cies* which may thereafter occur for like causes, in like manner. The
deed, in case there is like to be a failure of trustees from the refusal
or neglect of the surviving or remaining trustee to appoint, or from
the neglect of both, or either, of the trustees named in the deed to
act, gives to the railroad company a right to apply to a court of
chancery for the appointment of trustees. The deed also provides
for an annual and fixed compensation of the trustees ; except that
in case they take possession, they are to have a reasonable compen-
sation.

This is a case where the trusteeship as to Thatcher only has been

*perpetuated*, according to the power given in the mortgage deed. Henshaw was an original trustee under the deed; and it is not claimed that the present trustees are not proper persons to perform the trust; neither are there any allegations against their fidelity; and indeed, for the purpose of the present hearing, both their suitableness and their fidelity are to be taken as a conceded point; excepting it is claimed, on behalf of the petitioners, in argument, that they were guilty of neglect of duty in not calling a meeting of the bondholders, or creditors, and submitting to them a report of their business and proceedings, according to the provisions of the first section of the act of 1857, which will be remarked on hereafter. The present trustees claim both the right and the privilege of continuing in the discharge of their trust. The railroad company claim the same for them, as well as for themselves. It may be remarked, that this is not an application to confirm the nomination of the new trustees, to prevent a failure of the performance of the trust, for the want of suitable trustees, either from accident or from the refusal of the old trustees to act, or from their original, or a subsequent, inability to act, or from any other cause whatever. It is no doubt true, the court may remove a joint trustee upon the ground that the other trustees will not act with him, as was done in the case of *Uvedale* v. *Ettrick*, 2 Chan. Cases, 130, to which we have been referred; but that case went upon the ground that without *this*, the due execution of the trust, and the proper disposition of the trust fund, would be endangered So in *Lake* v. *De Lambert*, 4 Vesey, 593, the Lord Chancellor discharged a trustee who had become a feme covert, and appointed a new trustee; and this was upon the ground that it was very inconvenient for a married woman to be a trustee; and it may be assumed as a principle long recognized by courts of equity, as to trusts, that there shall always be a *competent* trustee; and in case of a failure, the court will take upon itself the execution of the trust, through the intervention of their own trustee.

In *Hibbard* v. *Lambe*, 309, the testatrix gave several legacies and annuities, payable out of her estate, and the residue to be disposed of in charity, *to such persons, and in such manner, as her executors, or the survivors of them*, should think fit, and appointed four execu-

tors; and two of them being dead, and another very infirm, the Lord Chancellor appointed additional trustees to sustain the annuities; but as to the *residue* of the estate, he said they could not dispose of *that* in charity. The testator having confined that power to her executors only, chancery could not take it away. The case of *Ex parte* Blackburne, 1 Jacob & Walker, 296, is on the same principle. There the court appointed other trustees to *hold the funds*, but left the selection of the objects of the charity to the trustees, to whom the founder of the charity gave it. We apprehend that where there is a power given in an instrument for the purpose of perpetuating a trust, by the appointment of new trustees, chancery will not control the parties in the execution of it, although no doubt it will take care that it is duly exercised. Jeremy's Equity, 173; *Webb* v. *Earl of Shaftsbury*, 7 Vesey, 480; *Haight et al.* v. *Day et al.*, 1 John. Cancery, 18; Hill on Trustees, 184; *Attorney General* v. *Caius College*, 2 Keen, 150, 165; 2 Sugd. Powers, 531, 6th ed. In Jeremy's Equity, 173, it is said, "where it becomes desirable that new trustees should be appointed, but there is no power in the instrument creating the trust for that purpose, or there being one, it does not extend to the event which has happened, the court of chancery, if it has command over the legal estate, will make the necessary appointment; and if a trustee should refuse to act in the performance of the trusts, the court would compel him to execute a conveyance of the legal estate, in order that the purposes of the trust might be attained."

We apprehend, then, if this proceeding had been by bill, (and under the 6th section of the act of 1857, it might seem as if the proceeding might be a summary one by petition to the chancellor at any time) that no cause is shown which, upon common chancery principles, would justify the court in removing the old trustees, and appointing new ones. I say in appointing new ones; for though the chancellor, in the language of the statute, is called upon to confirm the nomination of the bondholders, yet it requires the same power to confirm this nomination, that it would one made by a master, upon a reference by the chancellor. In regard to what has been said in argument, in respect to the neglect of the old trustees to call a meeting of the bondholders, and submit their report, it is evident that

this, in the petition, was not made a ground for their removal; but it is recited for the purpose of showing a right in the bondholders to call the meeting, &c., under the subsequent sections. Besides, it is evident, from the answers of the trustees, that they acted under the advice of counsel in their omission to call a meeting of the bond-holders, upon the ground that the act of 1857 was invalid; and though there may be no objection to the validity of the first section of that act, yet it is not every mistake, or neglect of duty, that will induce a court of equity to remove trustees. The ordinary rule is, that the omission of duty must be such as to endanger the trust property, or show a want of capacity, or honesty, or want of reasonable fidelity.

The question, then, returns as to the effect of the act of 1857. Is it of a character to affect, essentially, the rights of the parties, created by and under the mortgage? If it does, it impairs the obligation of that contract. The effect of the act, if carried out, is to confer upon the chancellor a power to take from the old trustees the trust property, and to invest it in the new trustees, by ordering a transfer of the property, as he may deem necessary and just; which would seem not only to involve the right to control both the equitable interests of the bondholders, as well as of the railroad corporation, but also the legal title in the trustees; and this while the trust is still an active one, involving active duties on the part of the trustees, and while the trustees have personal claims upon the trust property for indemnity for advances made, and liabilities incurred.

It is, however, said in argument by the petitioners, that it is not necessary to hold that the *legal estate* is to be vested in the new board of trustees. But we apprehend that the intention of the legislature was that the new board should succeed to all the powers of the old board of trustees. The act is, the chancellor shall have power to ratify and confirm the nomination of the trustees, and make such order and decree, *for the purpose of transferring the property* to such new trustees as he may deem necessary and just; that is, as we understand it, *the title to the property.* It would seem essential that the court should have control over the legal title, that they might compel the old trustees to convey it to the new ones clothed with the

APPENDIX A.

trust, that the purposes of it might be attained ; but be this as it may, we do not deem it of any essential or decisive importance. To this mortgage deed there are, in effect, three distinct parties with distinct interests ; the railroad company, the trustees, and the bondholders, or *cestui que trusts*, by implication. The property mortgaged belonged to the railroad company. It was mortgaged to secure their debt ; they have still a redeemable interest in it, and are interested in the amount and application of the avails, or income of the property. The trustees have the right to perpetuate the trust in their successors, and when they shall have taken possession of the property, they are to manage the same *in their own discretion*, and pay over the avails, &c. ; and are clothed with a power of sale at public auction, upon a given contingency, *at such place as they in their discretion shall deem best.*

Those who became bondholders, or creditors, of the corporation, under this mortgage, thereby, by implication, assented to all its provisions ; and all that they can claim of the trustees, at law or in equity, in the present state of things, is that all its provisions should be fully performed, and the trust faithfully executed ; and the railroad company have the right to claim the same at the hands of the trustees.

A nice distinction was early taken, between the *obligation* of a contract and the *remedy* for its non-performance, and out of this much discussion has arisen ; but it is by no means necessary to review the cases upon this fanciful distinction for the purposes of this case. In *Bronson* v. *Shinzie*, 1 Howard, 311, Ch. J. Taney says : " whatever belongs merely to the remedy may be altered according to the will of the state, provided the alteration does not impair the obligation of the contract ;" which is no doubt true ; but if it has that effect, it can be of no importance whether the law acts on the remedy or directly on the contract itself. There is difficulty, many times, in determining whether the change made in the remedy has substantially impaired the rights and interests of the creditor, and this must rest in the judicial discretion of the court. When it is found to have this effect, the law must be held void. The cases of *Green* v. *Biddle*, 8 Wheaton 1 ; *Bronson* v. *Kenzie*, 1 Howard 311 ; *McCracken* v.

*Hayward*, 2 How., 608, and *Curran* v. *State of Arkansas, et al.*, 15 Howard, 304, embody, I think, the true doctrine in this particular. It has been fully urged in the argument, by the counsel of the petitioners, that the statute of 1857 acts upon the remedy simply, and that that legislation only is prohibited which operates directly upon the contract itself, and that if it falls short of this, and merely affects the contract incidentally, or consequentially, it is rightful legislation.

This position is broader than can be sustained. But we think that the statute in question does not strike at the *remedy* which the existing law had provided for the violation of the contract in question. The petitioners complain of no violation of any contract; they seek no remedy for such violation. The act does, in our opinion, operate to dispense with and impair materially the rights and interests of the railroad company, of the trustees under the mortgage, and of the bondholders, who have not in any way assented to the act by participating in the meeting which nominated the new trustees, or in bringing this petition.

The railroad company had the right to select their own trustees, and to provide for filling vacancies, and it was a matter of election with the petitioners and others, whether they would become bondholders, with such trustees as the railroad company had constituted, with the trusts specified in the deed, including the power of perpetuating the board of trustees. The duties of the trustees now in possession of the road are important and difficult, and require great judgment and experience, and can it be said, so long as the railroad company have an equity of redemption in the mortgaged property, and the obligations secured by the mortgage are outstanding against them, that they have no interest in the administration of the trust, and that the law does not operate to impair their vested rights under the contract? They, no doubt, deemed the appointment of the trustees of primary importance.

The bondholders, too, had an interest in the personal administration of the trust by the trustees named in the mortgage, and those who should be appointed in pursuance of the power therein contained. The statute provides that bondholders to the amount of fifty thousand

dollars in the aggregate, may call the meeting, and the case shows that less than a majority of the bondholders, in amount, were represented at the meeting which made the nomination of the new trustees. But if the majority had been present, this is not a case where the majority could bind the minority.

The trustees themselves have, personally, certain rights which the indenture secures to them. They have the exclusive power to manage the affairs of the railroad company, and regulate the concerns of the corporation, according to their own discretion ; and the indenture also gives to them and their successors the power to perpetuate the trust, and provides for their personal compensation. The visatorial power, if I may use that expression, belongs exclusively to them, while in possession, and in the performance of the trust. The trustees have a vested right and a legal interest in their office, and it cannot be divested but by due course of law. One point decided in the Dartmouth College case, 4, U. S. Cond. R. 582, 3. was that the trustees of the college had personal and individual rights, under the contract with them, which the legislature could not take from them, any more than it could take from the corporation the rights which belonged to them.

We apprehend the Dartmouth College case, and subsequent cases decided upon the authority of that case, when rightly understood and applied, must be conclusive of the character of the law now in question. In that case, the trustees of Dartmouth College, became a body corporate, possessing the whole corporate powers, including that of holding real and personal estate, which were vested in twelve trustees, clothed with power of filling all vacancies occurring in their board. The act of the legislature of New Hampshire increased the number of trustees to twenty-one, and provided that the additional number should be appointed by the Governor of the state, and a board of twenty-five overseers was also created, twenty-one of whom were also to be appointed by the executive. There was no attempt to change or divert the funds of the college to any other or different use, than the one contemplated in the original charter ; but the change was simply in the regency of the college and in the method of the perpetuation of that regency. The ground assumed by New

Hampshire was, that the college charter was simply a civil corpora-
tion, and a grant of power for political purposes, regarding instruc-
tion as a matter of public concern, and that the trustees under the
charter had no vested beneficial or pecuniary interest entitled to pro-
tection, and they assumed the ground, that for these reasons the char-
ter was not a contract within the meaning of the constitution.   It is
well known that both grounds were overruled by the supreme court
of the United States ; they holding that the college was not a *civil*
institution, but was an eleemosynary corporation, and that the char-
tar was a contract for the security and disposition of property for the
purposes specified in the charter, and within the spirit and letter of
the constitution, and that the trustees represented the donors of the
original funds, were in reality the assignees of their rights, and stood
in their place and were equally entitled to protection.

Much more do the old trustees, in this case; represent the railroad
corporation, and, by means of the indenture, stand as the assignees
of their rights, and they are now running the road in their stead, and
for their benefit, though under a trust that the avails shall be applied
for the benefit of certain bondholders, or creditors, of the corpora-
tion, in cancellation of their debts.  . The trustees are clothed with a
double trust, a trust to the company, and also to the bondholders ;
and can it be said that they have not a vested interest, which cannot
be divested but by due course of law ?   The case in 2 Fairfield Rep.,
118, of the trustees of the *New Gloucester School Fund* v. *William
Bradbury*, is a strong case, negating the power of the legislature
to pass a law to change trustees.   The town of New Gloucester held
lands by grant from Massachusetts, before the separation of Maine
from that state, *for the use of schools in that town*, and the town deem-
ing it best to have the lands sold, on their application, and by their
consent, the legislature of Maine passed a law incorporating certain
persons, by the name of " The Trustees of New Gloucester School
Fund, in the County of Cumberland," and authorized them to sell
the lands, put the proceeds at use, and to appropriate the interest
annually to the support of schools in town, and empowering them to
fill vacancies in their board, with other provisions not now material.
The legislature subsequently passed a law authorizing the town to

choose a new set of trustees, and directed the first set of trustees to deliver over the trust property to them. The court held that the first act, passed upon the application of the town, put an end to the right of the town to manage the school lands; that the right to manage the fund raised by the sale of the land was never in the town, but by that act was vested in the designated trustees; that this proceeding constituted a contract; that the trustees had a legal interest in it, and as they had accepted of the trust, and were entitled to compensation, the subsequent act, empowering the town to choose new trustees and directing the old trustees to deliver over the trust property to them, was adjudged to be unconstitutional *and void.* It may be remarked in this case, the grant of the land to the town was *for the use of* schools in it. The town had the legal control of the lands, and, in one sense, the beneficial use; and when they were sold under the act of the legislature, passed by the procurement of the town, and the avails vested in trustees, the town still had the right that the income of the avails should be applied to sustain their town schools. This was a well argued and considered case, both by counsel and court, and is, I think, a sound one. The court base themselves on the Dartmouth College case, as well as *Pawlet* v. *Clark*, 9 Cranch 294; *Hampshire* v. *Franklin*, 16 Massachusetts, 84; *Green* v. *Brunswick*; *Allen* v. *McKeen*, 1 Summer, Rep. 296, and *Richardson* v. *Brown*, 6 Greenl., 355.

The cases of *Norris* v. *Abingdon Academy*, 7 Gill & Johns. 14, and of the *University of Maryland*, 9 Gill & Johns. 365, are fully illustrative of the same principle. See also *Louisville* v. *The University*, 15, B. Monroe, 642.

In Commonwealth *ex rel., Claghorn* v. *Cullen, et al.*, 1 Harris, 133, it was held that an act increasing the number of trustees of the Equitable Life Insurance Company of Philadelphia, and changing the time of their election, without the assent of the corporation, constituted a substantive alteration of the charter, and was an invalid act, prohibited by the United States Constitution. It defeated, or rather changed, the *regency* of the affairs of the corporation.

In the case now before us, the act of 1857 proposes to change the regency of the affairs of the corporation, from the old board to an

entire new one, and to increase the number from two to a number not less than three, nor more than five ; to change entirely the mode of the appointment ; and gives to the new board the right to fill vacancies, changing the residence of a part of them from Massachusetts, where the mortgage deed requires them to live, to Vermont, and closing up with a provision that the new board, upon their confirmation, and their successors in office, shall be a corporation, and have, hold and manage the trust property, as a corporation, by means of which, all personal responsibility of the trustees, as a matter of course, would be dispensed with.

In *Brown et al.* v. *Hummel et al.*, 6 Barr., 86, " The Principal and Trustees of the *Emaus Orphan House*," were incorporated, with the right of *perpetual succession*, and subsequently an act was passed, giving to the court of common pleas of Dauphin county the power to appoint trustees on the nomination of certain synods of the Lutheran church, and it was held that this act was invalid. Here, too, was only a change in the regency of the fund, which was designed for the benefit of orphan children. In our own court, *Poultney* v. *Wells,* 1 Aiken, 180, where a part of the town of Wells had been set off to Poultney, it was held that the legislature had no power to give the town of Poultney any portion of the school fund arising from the school lot in Wells, without the consent of that town. It would have been equitable that Poultney, as she took a part of the territory of Wells, should have a proportional part of her school fund ; yet the legislature could not take from the trustees of this fund in Wells, and give any portion of it to the trustees of Poultney, It was beyond their control, except as founded in the consent of Wells. See also *Montpelier* v. *East Montpelier*, 27 Vermont, 710–11–12. The objection there was, that the legislature could not divide and sever an entire trust into two fragments, and constitute a distinct regency over each fragment, which, before division, was under one regency, composed, it is true, of what was split up into two distinct boards.

On the effect of the law of 1857, it appears to me, but one opinion can be entertained. Between the legislature's acting directly, and acting through the agency of trustees nominated by a portion of the

41

bondholders, and confirmed by the order of a chancellor, no essential difference can be perceived. The whole power of controlling and managing the railroad property, is to be transferred from the trustees appointed according to the will of the mortgagor, as expressed in the indenture, to trustees nominated and appointed by another board, over which the mortgagor has no control.

*The will, judgment and discretion* of the new trustees are to be substituted for the *will, judgment and discretion* of the trustees appointed by the mortgagors, or in pursuance of the power which they have given. This is a change which materially affects the rights of the mortgagors, the old trustees, and the bondholders.

It has not escaped us, that the task of setting aside an enactment by a co-ordinate branch of the government, upon the ground that they have transcended their powers, is a most delicate, difficult, and an ungracious one, and the power should be exercised with the most deliberate circumspection.

The constitution of the United States relative to matters within its provisions, is the supreme law of the land, to which all must bow, and a power must be deposited somewhere, to pronounce upon the conformity of the acts of the delegated power to the *fundamental law*. The power must be, and is, deposited with the judiciary, and though this high trust should be executed with the highest degree of prudence, and the legislature are not to be adjudged to have transcended their powers, and their acts to be declared void, upon slight implications and conjectures; yet, when their unconstitutionality is made clear, that court which shall hesitate to declare them *void* must be unmindful of the solemn obligations which that station has imposed upon them. It results from this opinion, that the act of 1857, in its provisions which are immediately involved in the sustaining of this petition, as applied to the facts of the case, is repugnant to that provision in the constitution of the United States which prohibits a state legislature from passing any law to impair the obligation of a contract, and is *void*. The order and decree of the chancellor is, that the petition be dismissed, with costs.

The chancellor would remark, in conclusion, that from the importance of the question, and from the high probability that no appeal

Fletcher et al. *v.* R. & B. R. R. Co. et al.

could be sustained from this summary proceeding, by invitation, and out of courtesy to the chancellor, and in pursuance of prior arrangements, three of his brethren of the supreme court have set with him in the argument of the cause, and partaken in the deliberations of the court.   Chief Justice REDFIELD was necessarily absent, and Justice ALDIS declined to sit in the cause.

G. F. EDMUNDS,  }
J. W. STEWART,  } *For Petitioners.*
E. J. PHELPS,   }

ASAHEL.PECK,      }  *For Petitionees.*
L. E. CHITTENDEN, }

We were present at the argument of this cause before Chancellor Bennett, and have examined the foregoing opinion of the Chancellor, and fully concur therein.

LUKE P. POLAND, }  *Judges of the*
JAMES BARRETT,  }  *Supreme Court.*

At the request of the counsel in this case, and of the chancellor, I have examined the printed briefs of the counsel, and the opinion of the chancellor, with some care, and have given a good deal of attention to the general question involved, in a recent opinion upon the rights and duties of trustees, and the power of the legislature to control their functions and duties; and I cannot see how the statute in question in this case can fairly be regarded as constitutional, in all its provisions. I think the result to which the chancellor has come, in this cause, is the only one which is consistent with the decided cases upon the subject; and I concur in the general course of the argument, by which that result is attained.

ISAAC F. REDFIELD,
*Chief Justice of the Supreme Court.*