STEPHEN H. WILLIAMS *v.* THE TOWN OF NORTH HERO AND DAVID DODDS.

*Ejectment. Right of First Settled Minister. Settlement of Minister.*

The charter of the town of "Two Heros," embracing what was called in it, Grand Isle, alias Grand Island, was granted by the legislature in 1779, and reserved six rights or equal shares to the several public uses therein named, to wit: "On the south part thereof, sometimes called the South Island, one right for the first settled minister of the gospel, one right for the support of the ministry, and one right for the support of an English school or schools; and on the north part thereof, sometimes called the North Island [now the town of North Hero], an equal number of rights, for the same uses and purposes; * * * which said six rights or equal shares, when located as aforesaid, shall, together with their improvements, rights, rents, profits, dues, and interest, remain unalienably appropriated to the uses and purposes for which they are respectively assigned, *and be under the charge, direction, and disposal of the inhabitants of said island forever.*" *Held,* that the participation of the inhabitants in the *disposal* contemplated by the provision of said charter, was to be such as should thereafter be provided for by the laws of the state under and by virtue of which a valid settlement of a minister should be made.

In 1788, the town of "Two Heros" was divided into the towns of North Hero and South Hero; and in 1798, South Hero was divided into two towns. The land in question was drawn to the right of the first settled minister in North Hero, and the plaintiff claimed title thereto, as such minister, by virtue of his settlement on the 18th of November, 1862, as pastor of a Congregational church then formed in said town. There was no settled minister in said town prior to the 15th of said November; but the defendants claimed that one E. was then legally settled therein, as pastor of an independent church formed on that day. Prior to 1861, E. was a member of the Methodist Church, and about a year prior thereto, had been ordained as a deacon in that church, and in 1861 he was ordained as an elder therein. He was an itinerant preacher for about a year thereafter, and then withdrew from the itinerancy, and became a local preacher for a short time in said town. In July, 1862, by leave of the proper church authority, he withdrew entirely from said church, surrendered his ministerial credentials, and ceased, thenceforth, to be a minister of that church, or a member of that, or any other church. Soon thereafter he applied for admission to the Congregational church at Alburgh, and was refused. Thereafter, knowing that the plaintiff had been preaching a short time in North Hero, and that the organization of a Congregational church there was contemplated, and the installation of the plaintiff as its pastor, and that proceedings had been commenced with a view to such organization and installation on the 18th of November aforesaid, he posted a notice in two public places in said town, signed by himself, requesting all persons disposed to form an independent church and aid society, to meet at the courthouse in said town, on the 15th of said November, at an hour named, for that purpose. A number of the inhabitants of North Hero assembled pursuant to said call, and formed an independent church, consisting of three members, and an aid society, and adopted a constitution, articles of faith, and the form of covenant and reception into said church, and a constitution and by-laws of said society. E. was then settled and agreed upon in the constitution as pastor of said church, by his consent, and was to permanently remain pastor thereof, but he never became a member of said church, except by being named as pastor in the constitution. E's main object in organizing said church, was to get title to the land in question. He continued to preach to said church four or five years, but no new members were added thereto, and the sacrament was administered but once. *Held,* that E. was not thereby legally settled as a minister in said town.

On the 18th of said November, in accordance with prior proceedings in compliance with the usages and practices of the Congregational Church, a Congregational church was duly organized in said town, and the plaintiff regularly installed as pastor thereof, and settled as minister over said church and people, with all the forms and ceremonies usual in such cases in the Congregational Church. The inhabitants of North Hero did not participate in the settlement of the plaintiff, in their corporate and municipal capacity, but only a few of them, in their individual and social capacity. *Held,* that the only interest which the inhabitants of said town had in the land in question, under said charter, aside from naked trusteeship awaiting the settlement of a minister, was moral, religious, and social—not directly pecuniary; and this, not a corporate, but a several, personal interest of the inhabitants, as members of the body-social, and not of the body-municipal; and that the plaintiff was legally settled as a minister in said town, and, being the first settled minister therein, entitled to the land in question, in fee.

EJECTMENT for land in North Hero. The case was referred, and the referee reported the following facts :

" I find that the land described in the declaration, is the land that was set or drawn to the right of the first settled minister in the town of North Hero, according to the provisions of the original charter of the town of " Two Heros," and the acts of the leg-

islature subsequently passed, dividing said town into the towns of North Hero and South Hero, &c.; that the defendants were in possession at the time this suit was commenced, and had been for many years previous to that time; that the plaintiff demanded the possession of the premises of the defendants prior to the commencement of this suit, and that the defendants refused to surrender the possession to the plaintiff. The plaintiff claims the land in question, on the ground that he is the person that was first settled as a minister of the gospel in the said town of North Hero, and that as such first settled minister he is entitled to the land. From the concessions of the parties, the records of the proceedings relating to the subject, and the oral testimony introduced before me, I find that on the 18th day of November, 1862, and for a long time prior thereto, the plaintiff was and had been a regularly ordained minister of the gospel, and duly licensed and authorized to preach, and was eligible to a settlement over a Congregational church; that on the said 18th day of November, in accordance with prior proceedings in compliance with the usages and practices of the Congregational Church, a Congregational church was duly organized in said North Hero, and the plaintiff was regularly installed as its pastor, and settled as the minister over said church and people in said North Hero, with all the forms and ceremonies usual in such cases in the Congregational Church. This settlement was upon the mutual agreement of the pastor and church and people, and was permanent in its character. The plaintiff thereupon became a settled minister of the gospel in the town of North Hero, within the meaning of the charter, such as would be entitled to all the rights in the land in controversy that would vest in the first settled minister of the gospel in said town, if the plaintiff was in fact the first settled minister. The defendants admit that prior to the 15th of November, 1862, there had been no minister of the gospel settled in said town of North Hero; but they insist that if any minister has been settled therein, Alfred Eaton was so settled on that day, and that the claim of the plaintiff to the land in controversy is thereby defeated. I find that prior to 1861, the said Eaton was a member of the Methodist Church, and about a year prior to 1861, he was ordained as a deacon in that church, and in 1861 he was ordained as an elder in said church; that he was an itinerant preacher for one year, and then withdrew from the itinerancy, and became a local preacher in North Hero for a short time. This was with the permission of the Methodist conference. In July, 1862, he applied to the Methodist Quarterly Conference, to withdraw entirely from the Methodist Church, and was permitted to do so. He then

withdrew from the church, surrendered his credentials as a minister, and ceased, thenceforth, to be a minister of that church, or a member of that or any other church. Not long after this he applied for admission to the Congregational church at Alburgh. The consideration of this application was deferred from time to time, and finally that church declined to receive him as a member. After this, knowing that the plaintiff had been preaching a short time in North Hero, and that it was in contemplation to organize a Congregational church there, and to install the plaintiff over it as its pastor, and that proceedings had been commenced with a view to such organization and installation on the 18th of November, he posted up a notice in two public places in said town, signed by him, requesting all persons disposed to form an independent church and aid society, to meet at the courthouse in North Hero, on the 15th of November, at a specified hour, for that purpose. On said 15th of November, a number of people met at the place named, and such proceedings were had as are shown by the record of the meeting, [hereinafter stated]. At this time he was not a member of any church, and did not become a member of this church, otherwise than being named in its proceedings as its pastor. This church, when organized, consisted of but three members, and although the said Eaton preached there for four or five years, no new members were added, and the sacrament was administered but once. In organizing these churches, both had in view the fact that this land could be made available in aid of the minister. The primary object in organizing the Congregational church was, to promote the cause of religion, and advance Christ's kingdom; and this land was relied upon as a means to that end. In organizing the independent church, the main object on the part of Mr. Eaton (the originator and principal operator in the movement), was, to get a title to the land in question, and the church organization was the means by which he sought to accomplish his object.

   " In view of all the facts and circumstances, I decide that Mr. Eaton did not become, and was not on the 18th day of November, 1862, a settled minister of the gospel in the town of North Hero, within the meaning of the original charter of the town. The number of members of the Congregational church at its organization, was few; but the number materially increased subsequently, under the ministrations of the plaintiff as its pastor. I decide upon the whole case, that the plaintiff was the first minister of the gospel settled in the town of North Hero, and is entitled to all the rights that, under the said charter, vest in the first settled minister of the gospel.

"The question then arises; what are the rights of the first settled minister? On this point, the important words in the charter are the following: 'One right for *the first settled minister of the gospel*, one right for the support of the ministry, and one right for the support of an English school or schools, * * * which rights shall, together with their improvements, rights, rents, profits, dues, and interest, remain unalienably appropriated to the uses and purposes for which they are respectively assigned, and be under the charge, direction, and disposal of the inhabitants of said island forever.' The words of the last sentence are entirely appropriate when applied to the second and third lots granted, but seem not to be so when applied to the first. But, taking the whole passage in the charter together, in view of the state of the property at the time the charter was granted, the manifest object in view, the express and clear terms of the grant, and all the surrounding circumstances, I think it clear that it was the intent of the grant that the man who should be first settled as a minister of the gospel in the town, should take the lot in fee; that, until the minister should be settled, it should remain unalienably under the charge and direction of the town, and when a minister was so settled, to be disposed of by surrendering it to him, and if there should never be a minister settled there, then it would remain in the hands of the town forever. This, I think, would be appropriating the lot to the use and purpose for which it was assigned.

"I decide that the plaintiff, as such first settled minister of the gospel, took the title to the land in controversy in fee, and that he is entitled to recover the possession thereof in this action, together with the rents and profits as damages, from the first day of January, 1865, the time of the alleged eviction, to the 1st of January, 1871, being six years. I find the value of the use of the premises to be 80 dollars per year, making the damages 480 dollars, for which, together with the possession of the premises, and his cost, he should have judgment. In making these several decisions, I have intended to decide according to law."

The parties agreed, that at the time of the settlement of the plaintiff, the population of North Hero was 594, and the voters 100, and that this was to be considered as part of the report. They also agreed that the lot described in the declaration had been treated by the inhabitants of North Hero for the last fifty years, as the lot drawn to the right of the first settled minister of the gospel in said town; that during that time said town had by its

40

agents, leased the same as such lot, and received the rent thereof, according to the statute, and that the defendant Dodds was then in possession thereof under such a lease, and was at the commencement of this suit.

The defendant conceded, that prior to the proceedings under which the plaintiff claimed that a Congregational church was organized in North Hero, of which he claimed to have been subsequently the first settled minister, there resided in said town, Reuben C. Allen, Mrs. Amanda Allen, and Mrs. Lydia Allen ; that the said Reuben C. Allen and his wife the said Amanda Allen, were members of the Congregational church in good standing in the town of Grand Isle, and Mrs. Lydia Allen was a member of the Congregational church in good standing in the town of Georgia ; that said church in Grand Isle was and is a church in good standing in the Winooski Conference of Congregational churches, and the church in Georgia was and is in good standing in the North-western Consociation of Congregational churches ; that the said Reuben C. Allen, Amanda Allen, and Lydia Allen, being desirous of forming a Congregational church in North Hero, did, in accordance with the established rules and usages of the denomination of Christians to which they belonged, obtain letters from the churches to which they severally belonged, dismissing them from those churches, to take effect when they should be organized into a new church ; that on the 15th day of November, 1862, they sent a letter missive, inviting the pastors and delegates from the First Congregational church in St. Albans, and from the Congregational churches of Milton, South Hero, Grand Isle, and Alburgh, to be present. In pursuance of the invitation contained in said letter missive, the churches therein named were represented at the meeting of November 18, 1868, mentioned in the report. It appeared by the records of that meeting, that said letter was also signed by one Asahel Allen ; that the plaintiff preached and resided in North Hero from the second Sabbath previous to his claimed installation, until the month of December, 1867, acting as pastor of said church.

The plaintiff conceded that in April, 1860, said Eaton went to North Hero by order of the Methodist Episcopal Conference of

Vermont, and there remained as a minister of the gospel of the Methodist Episcopal Church, officiating as such in full order, from about April 21, 1861, down to about April 21, 1862, and at that time was located at said North Hero as an ordained local preacher of said church, by said conference, and remained there as such local preacher until July 5th, 1862. That from July 5th, 1862, down to November 15th, 1862, he remained at North Hero, and occasionally performed such duties as ministers of the gospel usually perform; that from November 15th, 1862, he officiated as pastor of an organization styling itself the Independent Church at North Hero, which, on said 15th of November, was organized at North Hero in the manner set forth in its book of records, at which time the said Eaton was agreed upon by some of the inhabitants of said town of North Hero, as the pastor of their said church, by his consent and agreement, as appears by the third article of their constitution, and was to remain permanently as such pastor; that as such pastor of that church he continued to officiate, performing all the functions and duties thereof, down to January 19th, 1867; that on the said 15th of November, at the call of the said Eaton, a number of the inhabitants of North Hero assembled at the courthouse in said town, and formed an organization called the Independent Church of North Hero, and an aid society, and drew up and adopted articles of faith of said church, and a constitution of said church and aid society; that at the same meeting, by-laws were also presented and adopted by said aid society, and the form of covenant and reception into said church, to be adopted by the members thereof, were presented and adopted by the persons there assembled. The charter of the town of *Two Heroes*, after the granting part, reads as follows:

" Which, together with the six following or equal shares, reserved to the several public uses in manner following, include the whole of said islands, viz: on the South Island, one right to the first settled minister of the gospel, one right for the support of the ministry, and one right for the support of an English school or schools; and on the north part thereof, or what is called the North Island, an equal number of rights for the same uses and purposes." * * " which said six rights shall, together with their improvements, rights, rents, profits, dues, and interest, remain

unalienably appropriated for the uses and purposes for which they are respectively assigned, and be under the charge, direction and disposal of the inhabitants of said island forever."

The court, at the February term, 1871, Grand Isle county, ROYCE, J. presiding, rendered judgment on the report, *pro forma*, for the plaintiff; to which the defendants excepted.

*R. H. Beardsley* and *Edson & Rand*, for the defendants.

This being an action of ejectment, the plaintiff must show that he had obtained a title in *fee*, in order to recover against the town. In order to do this, he must show, among other things, not only that he was an ordained minister, but that, as such, he was *first* properly *settled* in said town. Now, if Mr. Eaton was eligible to a settlement, as we claim he was, and the proceedings for that purpose were regular, then he was the first settled minister, because he was first in time, and the proceedings to settle him were as regular and valid as the proceedings to settle the plaintiff. If so, then the plaintiff could not be the first settled minister. The question is, whether the plaintiff was so settled, and in such a manner, as to be entitled to the lot in question *in fee*, or to any rights in the rents and profits thereof, under the charter. We claim he was not. The plaintiff was not the minister for the town, but the minister for the Congregational church, consisting then of only three members, and they were imported into the town for the purpose. The plaintiff was employed as the minister of that church and none other; he was installed over that church; he administered the sacrament in that church, and nowhere else, and was not bound by his contract to do so.

Now, we submit whether it was competent for those three members, without consulting the wishes of the inhabitants of the town, without public notice of their intentions, but secretly and surreptitiously, to get and settle a minister in such a way as to enable him to take the land to the exclusion of all other denominations of Christians in the town. Such a construction of the charter would do great injustice to the inhabitants of the town, and do violence to the obvious intention of the grantors. The charter is explicit, and cannot be construed to mean anything less than that

a minister, in order to become a settled minister of the town, within the meaning of the charter, so as to entitle him to the lot *in fee*, must have the concurrence and approbation of the town, expressed in its corporate action, or in some way to show that a majority of the inhabitants approbate the settlement of a particular minister. *Victory* v. *Wells*, 39 Vt. 488. Four years after this charter was granted, and when the provisions of the charter were fresh, the legislature, which was composed of many of the members of the legislature when the charter was granted, passed an act called the Certificate Act, declaring what should be necessary to settle a minister, in order to enable him to take the lot under this and other similar charters. Vt. State Papers, 1783, 472. The object of this act was, to carry out what they considered as the obvious meaning and intent of the grantors of the charter, and to define the manner of settling a minister in accordance with such construction, in whom the inhabitants of the town might choose to have the title vest. True, said act was repealed in 1839, the legislature deeming it no longer necessary to continue it, as, by the charter itself, a sufficient guard was provided to protect the inhabitants of the town against the surreptitious settlement of a minister by a few to the prejudice of the many.

Again, we claim that the settlement of the plaintiff (if it can be called a settlement), was originated and consummated in bad faith, having for its sole object, to vest the title in the plaintiff as the minister of a church consisting of only three members, to the exclusion of all others, which was *per se* a direct fraud upon the inhabitants of the town, and in violation of the language and spirit of the charter, and against the plain intention of the grantors. See the remarks of HUTCHINSON, J., in *Dow* v. *Hinesburgh et al.* 2 Aik. 18, 23.

If the court should decide that the plaintiff was legally settled, then we claim that Mr. Eaton was first legally settled. He was eligible to a settlement in North Hero. The inhabitants of that town had a right to organize any christian protestant church they saw fit, and to contract with Mr. Eaton to take charge of, and preside over it as minister and pastor. What is known by the Independent Church, is no novelty. There are many churches de-

nominated Independent churches, which have for many years been organized in England, Germany, Switzerland, and this country, and in other protestant countries; and a very large body of christians, of great piety and intelligence, belong to them.

But, we claim that under the provisions of the charter, neither the plaintiff nor Eaton was, or could be, so settled as to take the land *in fee*, without the participation of the inhabitants of the town in their corporate capacity, or in some other way a majority signifying their approbation of such settlement. To prevent the attempt and accomplishment of just such a purpose as the plaintiff inaugurated to secure a title in fee in the lot in question, was the object of the grantors of the charter. It was not the intention of the grantors that the title in fee should ever be vested in the first settled minister, but should remain in the town, and the minister to take only the use, so long as he remained and performed the duties of such minister. If he should die, or be dismissed for unworthiness, or move out of town, that use was intended to revert to the town for the support of a successor, and be appropriated for that purpose.

Again, we insist that the grantors intended to make the town the trustee of this lot, as well as the other lots named in the charter, reserved for public uses, and hence placed it with the others in the same sentence, *unalienably* under the control of the inhabitants of the town forever. *Grammar School* v. *Burt*, 11 Vt. 632; *Montpelier* v. *East Montpelier*, 27 Vt. 704.

We claim, if the court should decide even that the plaintiff was legally and first settled, it did not, and could not, *per se*, vest the legal title of the land in him, and hence this action cannot be sustained against the town; that if the court should decide that he was so settled, and in such a sense as to entitle him to receive the rents and profits of the lot, still, it would not entitle him to maintain ejectment; that if his settlement entitled him to receive the rents and profits, that title could only last while he continued the settled minister of the town.

*Noble & Smith* and *Bryant Hall*, for the plaintiff.

Three questions are involved in the consideration of this case:

I.  Was the original grant of the lot of land in question to the first settled minister, of such a nature as to vest the title of the land in fee in the minister first settled in North Hero in accordance with the requisites of the law.

II.  Was the assent of the town of North Hero, by vote in town meeting, essential to the valid settlement of a minister.

III.  Was the plaintiff, in point of fact, the first settled minister in the town of North Hero ?

In determining the meaning of the grant, the entire language used is to be taken into consideration, in connection with contemporaneous circumstances, and with the obvious purpose of the grant.   The clear and explicit language used in reference to the first right granted, considered in connection with the fact that the second right was granted by language immediately following and in connection with the positive injunction of the grant, renders it certain that it was the intention of the state to appropriate the first right mentioned in the grant to the first settled minister in North Hero *in fee*, and that the concluding language of the grant, " and be under the charge, direction and disposal of the inhabitants of said island forever," when applied to the two rights last mentioned, has its appropriate meaning ; but when applied to the right in question, is to have a limited meaning, and one in subordination to, and in accordance with, the obvious intention and purpose of the grant.   The only object in the provision that the first right should " be under the charge, direction and disposal of the inhabitants of said island forever," was, that that right should not be diverted from the object and purpose for which it was granted, to wit, to the first settled minister *in fee*, when one should be settled ; and to prevent this right from being diverted from the purpose of the grant, the custody, control, and disposition of the same, was given to the inhabitants of the island, with the positive injunction that it should " remain unalienably appropriated to the use and purpose for which it was assigned," that is to say, the town was absolutely prohibited from making any disposition of the right in question, inconsistent with its vesting *in fee* in the first settled minister.   And while it continued a statute duty of towns to support public worship (and at the time of this grant

it was not supposed that towns would ever be relieved from this duty), it was eminently appropriate that this grant be under the charge, direction, and disposal of the inhabitants of said island forever, for the purpose of the grant. And when a minister should be settled, then the object of committing this right to the charge, direction, and disposal of the inhabitants of said island having been accomplished by a disposition of the right to the "first settled minister," in accordance with the grant, and as any further "charge, direction, and disposal" of said inhabitants, through town action, would be inconsistent with the grant itself, it follows, necessarily, that all power on the part of said inhabitants to take any further charge or direction, or make any disposition, would cease from such settlement; otherwise a provision made to accomplish the grant, would become the means of preventing such accomplishment. *Warren* v. *Merrifield*, 8 Met. 95 ; 2 Parsons Cont. 499, 501, 513.

As to the second question, it may well be admitted that the assent of the people upon whom legally devolved the support of the minister settled, should be given to his settlement in order to its legality. And as the several towns in Vermont to as late a period as 1807, were obligated by statute law to support the settled minister, their assent, for this reason, and for this reason only, appeared to be essential to the legal settlement of a minister while this statute duty rested upon towns. But after the repeal of all laws obligating towns to support the preaching of the gospel, they could no longer act, either in reference to the support or settlement of a minister.

Again, towns are creatures of legislative will, and possess no power except what is derived from legislative enactment; and as there is no statute law in this state, enabling towns to act either in reference to the support or settlement of ministers, it follows that the action of any town, for either purpose, would be unauthorized and void. *The Bank of Rome* v. *The Village of Rome*, 18 N. Y. 38 ; *The City of Bridgeport* v. *The Housatonic R. R. Co.* 15 Conn. 475. The obligation imposed upon towns prior to 1807, to support the gospel, was transferred to those voluntary associations for the support of the gospel, pro-

vided for by subsequent statute laws of the state. It was evidently the design of the law that these voluntary associations and corporations should take the place of the towns in the support of the gospel, and that upon such associations and corporations should devolve the same right and duty to act in the settlement of ministers, that existed in towns while the statute duty of supporting the gospel was imposed upon them.

It is insisted that since 1807, towns as such have nothing to do in the settlement of ministers or the support of the gospel. In *New Market* v. *Smart*, 45 N. H. 87, it is held that when such an association becomes corporate, and capable of holding and managing its affairs, and the town was no longer charged with any duty relating to it, that the legal and beneficial estate vested in the society. See also *Porter* v. *Griswold*, 6 Mc. 434, which holds that "the parish have no control over them, or interest in them."

The people constituting the society formed in accordance with the laws of the state in aid of the church, must concur in the agreement of the pastor and church, and this, in connection with the ordination and installation of the pastor, will constitute a valid settlement. *Sheldon* v. *Goodsel*, 1 Aik. 226 ; *Dow* v. *Hinesburgh*, 2 Aik. 22 ; *Leicester* v. *Worcester*, 7 Allen, 92. The settlement of a minister over a church and society, without limitation as to its continuance, is a settlement for life. 3 Mass. 160 ; 9 Mass. 277. These principles being applied to the facts stated in the referee's report, that the settlement was upon the mutual agreement of the pastor, church, and people, and was permanent in its character, we have every requisite and condition necessary to constitute a valid settlement within the meaning of the grant, and one by virtue of which the title to the land in question vested in the plaintiff *in fee. Avery* v. *Tyringham*, 3 Mass. 173 ; *Charleston* v. *Allen*, 6 Vt. 641 ; *Pawlet* v. *Clark*, 9 Cranch, 363 ; *Porter* v. *Griswold, supra.* To hold that towns as such have any voice in the settlement of a minister of the gospel under the *laws now in force*, would in effect erect towns into arbitrary sovereign tribunals, to direct how and when a minister should be settled, with full power to defeat the settle-

41

ment of ministers and the object of grants to the first settled ministers.

The report of the referee clearly shows that the plaintiff, on the 18th day of November, 1862, was a regularly accredited minister of the Congregational Church, capable of being settled as a minister over any church of that denomination, and that he was on that day regularly installed and settled as such minister over a regularly organized Congregational church in North Hero, with all the forms and ceremonies usual in such cases in the Congregational Church. The facts in reference to the formation of the independent church, so called, and the installation of Mr. Eaton as its pastor, on the 15th day of November, 1862, do not show a valid settlement of him.

The opinion of the court was delivered by

BARRETT, J. The charter was granted in 1779 to Ethan Allen and others. It was entire, and embraced what were then known and called in it, South Island and North Island, and were designated as the "Two Heroes." They were separated in 1788 into the two townships of North Hero and South Hero. In 1798, South Hero was divided into what are now called South Hero and Grand Isle. The right in question was appropriated by that charter to the first settled minister. The controversy in this case is, mainly, as to the plaintiff's claim that he is entitled to that right, by reason of having become the first settled minister, according to the terms and meaning of the grant. This controversy hinges, mainly, on the closing expression in the provision of the grant, by which this and five other rights are reserved and appropriated to the purposes named, viz : "Which said six rights shall, together with their improvements, rights, rents, profits, dues, and interests, remain unalienably appropriated for the uses and purposes for which they are respectively assigned, and be under the charge, direction, and disposal of the inhabitants of said island forever."

It is claimed by the defence, that the inhabitants of the island did not so participate in the alleged settlement of the plaintiff, as to constitute the " *disposal* " intended by the charter, and as was

necessary, in order to entitle the plaintiff to take and hold as the first settled minister. In order to determine the meaning and effect to be given to the charter in this respect, it is proper to recur to the ideas, law, and usages, prevalent at the time the charter was granted. There was then no statute law on the subject in this state. In Massachusetts and Connecticut, from which states the greater portion of the inhabitants of this state had come, the matter of settling and supporting ministers of the gospel, and houses of religious worship, was the subject of town or parish duty, under statutory laws In ,this state, prior to statutes on the subject, that matter was administered upon the ideas, and after models, furnished by those states. Our first statute on the subject was made in 1783 (Slade's St. Papers, 472), in conformity to the same ideas and models. By it, towns were authorized to provide places for public worship, and for the settlement and support of ministers of the gospel, by a vote of two thirds of the legal voters being of similar sentiments as to the mode of worship. The next enactment was in 1787, making provisions for the same things in " corporated towns," and also by associations of persons not included in corporated towns, without regard to similarity of sentiment or sect. The next was in 1797, superseding the former statutes. In section 1, provision is made for the voluntary association of any number or description of persons, to agree and hire a minister ; to fix on a place or places, or to erect a house or houses, for social worship ; and to raise money by subscription, or on the list of polls and estate, and to collect the same by a collector. Sec. 2 provides for the associating of twenty-five or more of the inhabitants of the town, being of a similar sect or denomination of christians, into a society, with authority to appoint places of public worship, to determine places for building houses for public worship, &c. ; also, to vote to hire, or otherwise agree with, a minister to officiate in such town or parish, as the minister of such inhabitants ; and also further to vote any minister such settlement and annual support, in moneys or otherwise, as shall be thought will most conduce to the peace, happiness, and prosperity of such inhabitants, and to raise the same by taxes from time to time, to be assessed on the polls and ratable

estates of the inhabitants composing such society.   It is thus seen
that that statute—the only one in force after it was passed—pro-
vided equally for the association of any number, without regard
to the sect or denomination of the respective individuals thus as-
sociating ; and also for the associating of twenty-five or more of
a similar sect or denomination.   It is plainly apparent that the
latter kind of association is no more likely to embrace the greater
part of the inhabitants of the town, without regard to sect or de-
nomination, or of the greater part of the prevailing denomination,
than the former.   It seems plain that neither kind of association
was contemplated as representing the town, or as representing the
preponderance of religious sentiment, as against the residue of
the inhabitants of the town.   That statute of 1797 made an end
of any action by towns as such, and of any municipal corporate
function in the matter of public worship, and of the settlement
and support of ministers.   The whole matter was left to associa-
tions to be formed under that statute.

   That statute was modified in some of its details in 1801, and
was all repealed in 1807, except the first section, which pro-
vided for only voluntary associations, without regard to the sen-
timent, sect, or denomination of the individuals associating.   That
continued till 1814, when an act was passed which provided that
such associations might become corporations.   This continued to
be the statute law of this state till the revision of 1839, and, in
effect, it has thus continued to the present time.   As showing that
the legislature in 1814 had the idea that associations, formed and
becoming corporations in virtue of the act of that year above
named, were invested with the office and authority of *settling min-
isters*, the language of the form given in that act for the agree-
ment to associate, is significant, viz : " for the purpose of settling
and supporting a minister."

   Now, on recurring to the charter, it is to be noticed that it does
not intimate what shall constitute the requisite settlement of the
first settled minister, nor does it intimate by its terms that the
islands, in the exercise of municipal functions, or the inhabitants
of the islands in any municipal relations, are to have anything to
do in order to constitute a valid first settlement of a minister.

Yet, in view of the prevalent ideas and usages of the time, I doubt whether any other mode of settling a minister was in mind, or whether there was then any forecast as to probable changes in respect to that matter. It is not controverted, nor could it well be, in view of the terms of the charter, and of the history of the subject, both general and judicial, that he who should be the first minister lawfully settled, would take that right under the charter. In Williams' History of Vermont, 1st ed. 337; Ib. 2d. ed. vol. 2, 384, it is said that in the grants by Benning Wentworth, the third right reserved was for the first settled minister, "Intended for his private property, to encourage the settlement of a minister in the new plantations. In the grant of townships which have been made by the government of Vermont, two rights have been reserved for the support of the clergy: one for a parsonage, designed for the support of a minister, and unalienable from that purpose; another to become the property, and designed to encourage the settlement, of the first minister. This right accrues to the first clergyman who is settled in the town, of whatever denomination he may be. The salary of the minister ariseth wholly from the contract which the people may make with him. These contracts are altogether voluntary; but, when made, by a law passed October 18, 1787, are considered as being of equal force and obligation as any other contracts; but no persons of a different denomination are obliged by them. The law has no reference to any particular denomination, but considers them all as having a right to make what contracts they please, with the minister they choose; and being of course bound by their own act, to fulfill their contract. A law designed to confirm the equal rights of all, is not subject to the exceptions or complaints of any party." Thus wrote and published the learned and authentic Dr. Williams, in 1794, and republished in 1807, (printed in 1809.)

This view has been currently held by the profession and the courts in this state, as evinced in the cases in any way involving the subject, throughout our judicial history. See *Sheldon* v. *Goodsel*, 1 Aik. 225. In *Dow* v. *Hinesburgh et al.* 2 Aik. 18, HUTCHINSON, J., says: "There is no room for doubt that the object of the government, in granting a right of land to the first

settled minister in said town, was to encourage a minister to settle
and preach the gospel among the people of such town, while the
lands were uncultivated, and the inhabitants few in number, and
unable to contribute largely for the pecuniary support of a minis-
ter. This must, of course, answer the double purpose of encour-
agement to the minister to settle among them, and assist the
people to pay him. * * * Such settlement vests the title in him;
and when once vested, would not be divested by any after separa-
tion, or the dissolving such connection." *Charleston* v. *Allen*, 6
Vt. 633; *Williams* v. *Goddard*, 8 Vt. 492.

The purpose of appropriating those rights was prospective;
and, in respect to the right to the first settled minis·er, the time
when the appropriation would become vested, was altogether un-
certain and contingent. Such time would become fixed, and such
vesting would be effectuated, by the fact of the first settling of a
minister. Of course, it must have been in contemplation that
such settling was to and would be lawful and authentic—such as
would be practicable, according to the religious institutions and
usages, and the laws of the state at the time it should take place.
It cannot be supposed that it was in mind, in the making of the
grant, that such settlement was to be only according to religious
institutions and usages and the laws prevailing at the time of the
grant, in case such settlement should not be made till the then ex-
isting and prevailing institutions, usages, and laws had been
supplanted by others, and had become *effete* and ineffectual.
Probably no thought was given to the matter. So far as any
trust might seem to have been created in the inhabitants of the
town, or island, in reference to the right of the first settled min-
ister, it must be held to have been in subordination to the purpose
of the appropriation, and to the rights of the person entitled to
the land appropriated. In the expression, " and be under the
charge, direction, and disposal of the inhabitants of said island
forever," it could not have been intended that the word *forever*
should be operative to defeat the personal right of the party in
whom, when he should answer the call as being the first settled
minister, the grant was to become vested and accomplished in ab-
solute right in fee. And this leads us to refer to and adopt the

language of Judge ROYCE in *Williams* v. *Goddard*, *supra :* " There is a diversity in these grants or reservations. In some charters the right is simply reserved for the first settled minister in the town. In others it is reserved for the first settled minister, to be disposed of for that purpose, as the inhabitants of the town shall direct. Thus far the land is evidently destined, upon a legal and sufficient settlement of a minister, to vest absolutely in such minister as private property."

It is proper here to add, that in the charters granted by the state government, there is no uniformity in this respect. In some no minister right is reserved. In some it is to or for the first settled minister. In some it is for the use and support of the ministry. In some cases some provision is made for control and disposal by the inhabitants of the town. In some it is given in trust to the selectmen of the town. In some no provision at all is made in such respect. In one instance—Belvidere—the provision is, " Reserving the usual quantity of land for public uses reserved in other townships granted by the state." It is plain that the granting of the charters was not the " driving of a bargain" between parties. The reservations and appropriations were for general classes of purposes. The special details of provision, obviously, were not settled and adopted with sharpness of attention to the terms used, or with cautious consideration of the possible questions that the course of events thereafter, in the progress of population and society, might give rise to. The character and substance of the purposes are sufficiently manifested ; and provisions for their being realized, substantially, are embodied. The specific administration in the particular cases, was generally left without minute provision, and is to be done in effectuation of the purposes, when it can be within the scope, and without violating such provision as is made, fixing the manner of such administration. But to return to the right in question, it is plain that when the property appropriated should become vested in fee, by absolute title, in the party designated, any prior trust relation of the town to the property would be at an end. In this case the expression is, as before quoted, " and be under the charge, direction, and disposal of the inhabitants of the island forever." Now, if the

*disposal* contemplated by that provision is claimed to consist in the participation " of the inhabitants of the island " in settling a minister, in what way are they to participate ? What constituted the " Two Heroes " as the township created by the charter—and obviously meant by the expression, " of the island"—had the charge, direction, and disposal of the six rights reserved. When separated into two townships in 1788, in what way could " the inhabitants of the island" act in the disposal of the first settled minister right ? For it is insisted in behalf of the defence, that the expression meant, inhabitants in corporate organization. And again, after the further division of the South Hero into two towns in 1798, in what way were " the inhabitants of the island" to act in the disposal of the rights to the first settled minister. The case of *Montpelier* v. *East Montpelier*, 27 Vt. 704, would seem to intimate some difficulties in the way of reducing to practice the theory of corporate action, after such breaking up and distribution of the original body corporate.

Again, it would hardly seem practicable, or even plausible, to hold that the only way in which such disposal could be made, consistently with the terms of the charter, is by such action of the inhabitants of the original island town as was customary, accredited, and authentic at the time of the charter, in the settlement and support of a minister. If so, then the alteration of that mode by subsequent statutes, would thwart the vesting, and the purposes of the appropriation. And yet, in all the cases above cited involving the subject, the question and the decisive point has been, whether the settlement of the claimant was valid and effectual, according to the laws in force, not when the charter was granted, but when the alleged settlement was made.

In *Sheldon* v. *Goodsel, supra,* it is said : " There appears to have been no contract whatever between him and the people. Some such contract of binding force *according to existing laws,* has always been deemed necessary. While the *certificate act,* as it was called, was in force, there must have been a society formed according to that act ; and, in voting upon the subject of settling a minister, there must have been twenty-five legal voters in the affirmative, and two-thirds of those present must have voted in

the affirmative, in order to make their proceedings valid. So, now, there should be some regular proceeding under the first section of the same act, which is still in force. Several decisions, many years since, have gone upon this ground. Such a decision was made in the circuit court, in a dispute concerning the minister's right in Springfield." This case arose after the statute of 1814, and was decided in 1826. In *Dow* v. *Hinesburgh et al.*, *supra*, " The particular shape of this contract, and the manner of entering into it, in order to be thus binding, may depend on the laws that are in force when it is made." In that case the settlement was not made according to the provision of the statute of 1787, which was the law then in force, and therefore the settlement was held to be not valid.

Without deciding whether, by the terms of the charter, the inhabitants of the island town had anything to do with the *disposal* of the right to the first settled minister, and whether such *disposal* is not restricted to the other rights reserved in the charter, we do decide, upon the views above presented, with other concurring views which need not be expressed, that the participation of the inhabitants in the *disposal* contemplated by the provisions of the charter in that behalf, was to be such as should thereafter be provided for by the laws of the state under and by virtue of which a valid settlement of a minister was to be made. Our views and decision in this respect, find strong countenance in the consideration that it is not supposable that it has been the purpose or understanding of any of the legislation since the granting of the charter, to invalidate or render ineffectual that appropriation to the first settled minister ; and yet, this would effectually have been done, if a minister could be settled in compliance with the terms, and according to the intent, of the grant, only by the participation of the inhabitants of the town as chartered, acting in corporate capacity. It is plain that the practical legislative construction given to the appropriation to the first settled minister, has ever been the same as the uniform judicial construction. Such practical construction was evinced in the early as well as the later legislation affecting the subject, and particularly by the statute of 1787, and the statute of 1797.

It now remains to be considered, whether the plaintiff became settled according to the laws in force at the time of his alleged settlement. For the facts, we have to rely mainly on the report, and the documents referred to, giving such consideration to the comments and characterizations of counsel as to the transactions thus shown, as they may seem to merit. The evidence by documents and concessions tends to show the facts to be as found by the referee. The oral evidence is not before us, but we assume that it was legitimate, and was properly considered and applied by the referee, there being nothing in the case indicating the contrary. We adopt the fact as being established, that the plaintiff was authentically settled as a minister of the gospel over the Congregational church that was duly organized, upon a mutual agreement of the pastor and church and people, and such settlement was permanent in its character. The fewness of those who moved for the organization of the church, cannot render the proceeding futile. The lack of a church of the kind for so many years, and the fewness of those moving for one, would somewhat tend to evince both the need and the propriety of the measure. It is not suggested that any specific *minimum* is fixed by law, civil or ecclesiastic, or by usage, for the number that may legitimately move for, and become organized into, a valid church, over which a minister may have a valid settlement. The fact that such a church was organized by the customary co-operation of a council, upon the invitation shown by the record, indicates that the number moving the matter, and becoming organized into the church, was sufficient, according to the laws and usages of the Congregational denomination. It may have been the subject of regret that there were no more persons— church members—than the three who invited the council, qualified or disposed to participate in the call, and to become the beginnings of a church there by original membership ; but that there were no more, can hardly be regarded as good reason why the few should not exercise their right, and avail themselves of the privileges accorded by the polity of the church and denomination of which they were members, of having a church in the place of their residence, and thus enable themselves to have sound

doctrinal teaching, and enjoy the edification and ordinances of an approved gospel ministry and church, and at the same time affording to those around them the means of spiritual enlightenment and saving grace. Our statutes do not discountenance this. They enable it to be done. Public policy—"*boni mores*" —does not forbid it. It is in fact serving the very purpose for which the appropriation was made in the charter. The report shows that the agreement was for a permanent relation of pastor and people, such as has been held in the cases cited to be essential to such a settlement as the charter contemplates. The plaintiff, then, had a valid settlement.

Upon what appears, we think that Mr. Eaton was not settled as a minister, by the proceedings vouched in that behalf. At the time he called the meeting named, he was neither a minister nor member of a church. In July, 1862, he surrendered his credentials as a minister, and thenceforth ceased to be a minister of that (the Methodist) church, or a member of that, or any other church. We have not been shown, nor do we know of any canon of human or divine law, by which a person who has been ordained, and has officiated as a minister, can be compelled to retain the sacred official character implied in the fact of ordination. In the ecclesiastical polity of American protestantism, a person, once ordained, may be silenced and disrobed, and be left as naked a worldling as if he had never been clothed with "the livery of the court of Heaven." Equally may he renounce and cast off the character and the robe, and become equally as naked a worldling. Mr. Eaton did it in this case. It is a little difficult to master, satisfactorily, the idea of a person being a minister of the gospel, who is not of any known sect or denomination of christians; who has withdrawn himself from membership of the church to which he belonged; who has surrendered his credentials as a minister, and thenceforth ceased to be a member of that or any other church. After that withdrawal and surrender of credentials, how, or in virtue of what, did he continue to be a *minister* at all, in any recognized or appreciable sense, especially in the sense of the charter? When he put up the notices, prompted by the motive found by the referee, for the meeting of November 15, he was not a minister at all, nor was he when the

proceedings shown by the record were going on. When, and by what process, did 'he become such, according to any known or tolerable idea on that subject? Certainly the record does not answer, nor does the referee's report.

Again, the referee does not find, nor do we find in the record, anything that would bind Mr. Eaton to remain for any time as a settled minister. In terms he is not so bound, for he did not put his name to any of the papers of the organization; nor is it shown that he took part in any of the meetings as a voter. He called the first meeting, and presided at that and other meetings. If bound at all, it could only be by *estoppel*, and so bound only on the claim of the other party, or of those standing upon rights derived from that other party. The defendants are not such.

Finally, the object of Mr. Eaton in what he did in getting up the independent church, with himself as the pastor of it, as found by the referee, is conclusive against any right in him as the first settled minister. The accomplishment of such an object by such means, would be a fraud on the charter as to the matter of the appropriation in question, though it would hardly be entitled to the appellation of a "pious fraud." And this suggests to us to remark, that what was said in the argument as to the holding of the land by the plaintiff being a fraud on the inhabitants of the town, seems to have proceeded on the idea that the inhabitants of the town corporation had some proprietary right in the land in question, under the charter, beyond that of naked trustee, and rather as trustee coupled with an interest, such as would entitle them as a corporation to dispose of it for the designated purpose. We think that the only interest that they had, aside from the naked trusteeship, awaiting the settlement of a minister, was moral, religious, and social, not directly pecuniary; and this was not a corporate, but a several, personal interest of the inhabitants as members of the body social, and not of the body municipal. It was such an interest as all persons in the community have in any provision whose purpose is the moral, religious, and social improvement of such community. The report is conclusive against the fact of fraud on the part of the plaintiff, and shows that his settlement was made in effectuation of the leading purpose of the grant. Judgment affirmed.