THE TOWN OF MONTPELIER v. THE TOWN OF EAST MONT-PELIER.

*Legal title to lands reserved for public uses. Division of the town of Montpelier.*

The legal title to the rights of land in a township which, by the charter of the town, are reserved for public uses and placed "under the charge, direction, and disposal of the inhabitants of said township forever" is in the municipal corporation or town created by the charter.

But the town holds such legal title as trustee, and cannot use the funds derived from such rights for corporate or other purposes than those for which they were reserved.

The effect of the act of 1848, dividing the town of Montpelier was to abolish the old municipality and to create two *new* and distinct towns out of the same territory.

The fourth section of that act, which provides for a division of the property, &c. of the old town of Montpelier, has no reference to funds or property which that town held in trust.

If it had; *quære* as to its constitutionality. BENNETT, J.

Montpelier *v.* East Montpelier.

The effect of the act was to abolish the trustee of those rights of land which were reserved, in the charter of the original town, for public uses and placed under the charge of its inhabitants, and created no division of them between the two new towns. The new town of Montpelier succeeded to no interest in them as trustee and cannot maintain an action to recover any portion of the rents of those rights which may have been received by the new town of East Montpelier.

ASSUMPSIT. The plaintiffs claimed to recover the amount of money which was received of the defendants, in 1851, on the leases of the three lots of land, in the original town of Montpelier, which in the charter of said town, granted August 14, 1781, were described and reserved as follows, viz, "together with the five "following rights, reserved to the several public uses in manner "following, * * * lands to the amount of one right to be and "remain for the settlement of a minister, or ministers of the gospel "in said township forever; lands to the amount of one right for the "support of the social worship of God in said township; and lands "to the amount of one right, for the support of an English school "or schools in said township. * * * which said lands amount-"ing to the three rights, last mentioned, when located as aforesaid, "shall, together with their improvements, rights, rents, profits, dues, "and interests, remain unalienably appropriated to the uses and "purposes for which they are respectively assigned, and be under "the charge, direction and disposal of the inhabitants of said town-"ship forever."

Upon the trial by the county court, March Term, 1851,—POLAND, J., presiding,—the defendants waived all exceptions to the form of action, and the plaintiffs gave in evidence the charter of the town and the act of 1848 dividing the town, (the several provisions in and of which are sufficiently set forth in the opinion of the court,) and testimony proving the following facts.

The lands granted by said charter, for the settlement of a minister, and for the support of the ministry, and for the use and support of schools were, at the time of the division of said town, leased to various individuals by perpetual leases, which were in the office of the town clerk of Montpelier, and were afterwards delivered by the selectmen of the present town of Monpelier to the town treasurer of said town and have ever since been kept in his office; and notice was given to the lessees to pay the rents to said treasurer.

46

The treasurer of East Montpelier, between the first of January and the first of June, 1850, collected of the tenants the sum of $187.41 ; and afterwards went to the office of the treasurer of Montpelier and asked to look at said leases, and, upon their being handed to him, endorsed upon them the moneys so received by him as rents ; said collection and endorsements were made without any consent of said Montpelier.

The rents of the lands granted for the settlement and support of the ministry had been given, by the old town of Montpelier, for over forty years, to the several religious societies in said town.

Demand had been made of East Montpelier by the plaintiffs, of their proportion of said money.

The grand list for 1848, of Montpelier was $7,187.78, and of East Montpelier, $4,659.47.

The town of Montpelier as chartered contained about 23,000 acres ; by the act of division, the amount of territory given to East Montpelier, was about 17,000 acres, including all the lands granted for the settlement of a minister, support of ministry, and support of common schools ; the new town of Montpelier, at the time of division, contained 2,242 inhabitants, and East Montpelier, 1,431 inhabitants.

The court decided that the plaintiffs were entitled to recover a part of said rents, agreeably to the act of division, in proportion to the respective grand lists of said towns for 1848, and rendered judgment accordingly ; to which decision both plaintiffs and defendants excepted.

*J. A. Vail* and *Merrill & Willard*, for the plaintiffs.

*P. Dillingham* and *Peck & Colby*, for the defendants.

The opinion of the court was delivered, at the April Term, 1855, by

BENNETT, J.    This case has been before the court some length of time, and it is one with which the court have had some difficulty, and it now becomes my duty to announce the result to which they have come, and the grounds upon which that result is based.

The power of the legislature to alter, divide, modify, or abolish a municipal corporation, created for the purposes of government, is

not to be questioned; and we have no doubt, the effect of the act of 1848, dividing the town of Montpelier, was to abolish the old municipality of Montpelier, and to create two new and distinct municipalities out of the same territory, included in the old municipality. The first section of the act declares the town of Montpelier to be divided and incorporated into two distinct towns, giving the line of division.

The second section declares, that one division shall be called and known by the name of Montpelier, and the other by the name of East Montpelier; and that each of said towns, thereby created shall have, possess, and enjoy, the same powers, privileges, and immunities with all other incorporated towns in the state.

The eleventh section of the act provides, that " the said towns of " Montpelier and East Montpelier, shall become organized, and " their first meetings, respectively, shall be called and held in the " manner, prescribed by section eight of chapter thirteen of the " Revised Statutes."

From the peculiar and explicit language of the act, it is clear that it was the intention of the legislature to make two *new* and distinct corporations; and the effect of this, from necessity, must be to abolish the old municipality, for we cannot suppose it was the intention of the legislature that the old municipality should continue to exist with a curtailed territory, and at the same time a new municipality be created and organized out of the same territory. If, by the act, the town had been simply divided, creating East Monpelier a new municipality out of a part of the territory included in the old town of Montpelier, the old municipality of Monpelier, might, by implication, have continued to exist with a curtailed territory. And this I think, has been the usual mode that has been adopted in the division of towns. We must regard this suit, then, as brought by the new municipality, known as Montpelier, and for all legal and substantial purposes the name is of no particular account. The question then is, can this action be maintained, either to recover the whole fund or a part of it?

The charter of Montpelier was granted by the governor of the state, in 1781, and is declared to be incorporated into a township by that name and, after giving the boundaries, the inhabitants which then did or should thereafter inhabit said township are by the char-

ter declared to be enfranchised and entitled to all the privileges and immunities, which the inhabitants of other towns in the state enjoy. By the charter, five rights in the township are reserved for public uses, two of which are expressly placed at all times, under the control of the legislature, while the charter provides, that the other three rights shall remain for the uses for which they were assigned, and the rents and profits of the same, under the charge, direction, and disposal of the inhabitants of said township forever.

The uses for which these three rights are reserved are made perpetual, and the rights, and the rents and the profits thereof, are placed under the charge and direction of the inhabitants of said township. This suit only concerns the three latter rights, or the moneys received for the rents reserved on these rights.

We apprehend the legal title to these rights vested in the municipal corporation, though they are appropriated to the uses for which they were assigned by the way of a reservation. This has always been held to be the case in the New Hampshire grants, where in their charters certain rights have been reserved for public use, and as I understand it the decisions of our own courts have been the same as those of the New Hampshire courts upon the New Hampshire grants, and it was so held by Justice STORY, in the case of *Pawlet* v. *Clark*, in 9 Cranch. But the corporation, in the strictest sense, hold the legal title, as trustees, and cannot apply the funds to corporate purposes.

The individual inhabitants of the township, as incorporated in 1781, may be regarded as the *beneficiaries, or cestui que trusts.* All the right which the old municipality of Montpelier could have had to these funds was as trustees, and to see them applied to the uses to which they had been assigned.

The question then is, can the new township of Montpelier, incorporated under the act of 1848, maintain this action. If they can, a recovery would not be for their own use, but in trust, for the uses specified in the original charter. To simplify the case, we may suppose the defendant to be an entire stranger to all interest in the funds. The fact that East Montpelier may set up a conflicting claim to some portion of them, or even to the whole, cannot alter the principles upon which the plaintiff's claim must rest.

If this action can be sustained, it must be entirely by force of

the fourth section of the act of 1848, creating two new municipal corporations.

It is not necessary to call in question the powers of the legislature over municipal corporations, and the funds which belonged to them as such, and which they hold for their own corporate purposes. No such questions are before us. The object of this suit is to test the right of the present town of Montpelier to manage and control trust funds which, by the terms of the grant creating them, as contained in the charter of 1781, were, by the donors, declared should be under the charge, direction, and disposal of the inhabitants of said township forever. By this, as I understand it, is meant the inhabitants of the territory of Montpelier, as then chartered, but, as I now think, in their corporate capacity. The form of the gift in the original charter, is somewhat peculiar. An important inquiry then is, what should be the effect of the act of 1848, upon the legal control of these trust funds? Did the legislature attempt to divide these funds into two fragments, and give the control of one to Montpelier and that of the other to East Montpelier? We apprehend the construction of the act should be such, as to operate only, upon such property, as belonged to the towns for their own municipal and corporate purposes. The fourth section is: " all prop-
" erty now owned and possessed by, and debts or choses in action
" due to said town of Montpelier, shall be hereafter owned and
" enjoyed by, and collected for the said towns of Montpelier and
" East Montpelier, in proportion to the grand list of the persons
" and property within the territorial limits of said towns, for the
" year 1848, respectively."

These trust funds cannot be said to be owned and possessed by the town of Montpelier, and they could not be "owned and enjoyed," by the said towns of Montpelier and East Montpelier thereafter, or collected for their use. In *Harrison* v. *Bridgeton*, 16 Mass. 16, by the terms of the charter of the township of Bridgeton, one right was to be appropriated to the use of schools, and one right to the use of the ministry; and when the town of Harrison was incorporated out of a part of Bridgeton, and part out of an adjoining town, the act of incorporation provided for a division of all the property, rights and credits of the towns of Bridgeton, with the new town of Harrison; yet the court held, that the fund which were

held in trust were not within the act. We are inclined to give the act of 1848 a similar construction, otherwise, for one, I apprehend that the act providing for a division of the property of the town would be liable to constitutional objections.

There is nothing in the case to show any consent of the inhabitants of the old township to a division of these trust funds, between the two new corporations. If the fourth section of the act of 1848 was to be so construed, as to include property held in trust by the town, it might not, it is true, divert the fund from the objects for which they were designed by the donors; yet its effect would be, to divide into two parts, what before was an entire fund, and create a new and several regency for each fragment, when the donors by their grant made it an entire fund, and placed it under a different regency from what the act of 1848 would create for the control of each fragment.

In the *Dartmouth College case*, CH. JUSTICE MARSHALL well says, " that no authority exists in a government to regulate, control or divert a corporation or its funds, except where the corporation is, in the strictest sense, *public*, that is," he adds, " where the whole interests and franchises are the exclusive property and domain of the government itself." Although towns may be regarded as public corporations, created for political purposes; and although the corporations themselves, and the property belonging to them as municipal corporations, may be subject to the control of the legislature; yet if made the almoners of a charity, or the guardians of a trust fund, it by no means follows that the legislature can alter or change the trust.

In the *Dartmouth College case* v. *Woodward*, 4 Wheat. 188, there was no attempt to pervert the funds of the college to a use different from the one to which they had been assigned by the donors. The only object of the statute of the New Hampshire legislature was to change the regency of those funds, and yet the law was held unconstitutional.

So in the case of the *Commonwealth ex rel. Claghorn et al.* v. *Cullen et al.*, 1 Harris, 133, it was held that an act increasing the number of trustees and changing the time of their election without the assent of the corporation was not a valid act. See also *Brown* v. *Hummell*, 6 Barr. 86.

The case of the *Trustees of the New Gloucester School Fund* v. *Wm. Bradbury*, 2 Fairfield 118, is quite analogous to what the case before us would have been, had the fourth section of the act of 1848 extended in its terms, to include the trust funds now in dispute. In that case, an act of the legislature, authorizing the town to choose a new set of trustees for the school fund, and directing the first trustees to deliver over the trust property to them, was held unconstitutional. The school fund had the effect to reduce the sum to be raised and collected by taxation for the support of schools in the town, and in this way the town had a beneficial interest in the funds of the corporation, and brought the case, it is said, within the very language of the court in the case of *Dartmouth College* v. *Woodward*. The court repudiated an attempt to distinguish between the two cases upon the ground that New Gloucester was a municipal corporation.

In *Poultney* v. *Wells*, 1 Aik. 180, the legislature had set off a part of Wells to the town of Poultney, and it was held that they could not give to Poultney the control of any part of the fund arising from the school lot in Wells, without the consent of the town of Wells.

The case of *Plymouth* v. *Jackson*, 15 Penn. 44, is somewhat in point. Land situate in the township of Plymouth, was, by its proprietors, appropriated for the religious, literary and charitable uses of its inhabitants. After this, an act of the legislature was passed, empowering the owners of land within the township to elect officers who, when elected, were to become a body corporate, by the name of the " Proprietors of Plymouth,"—and the act provided that the interests in all lands and in all debts or demands, which should belong to the proprietors of Plymouth, should be vested in the corporation for the use of the proprietors. Previous to this act of incorporation, the township of Plymouth had been formed for municipal purposes, and subsequently, the township of Jackson was also formed for municipal purposes ;—both were formed partly out of land lying within the old township of Plymouth, and partly out of land lying without its boundaries. After this, by act of the assembly, the taxable inhabitants of Jackson township were authorized to elect officers, and who, when elected, were incorporated, by the name of the " Trustees of the township of Jackson,"—and the

act provided that, "all the rights, interests and claims, real and "personal, and all debts, dues and demands whatsoever, either in "the original fund of the proprietors of Plymouth, or otherwise, "which shall belong to any or all the inhabitants of the township "of Jackson, shall vest in said corporation, and be recoverable in "their name, by action at law, as in other cases." Upon this state of facts, it was held that the property in question belonged to the proprietors of Plymouth township who were incorporated for educational purposes, and not as a municipality; that the fund was the property of the incorporated proprietors of Plymouth, and could not be diverted by the legislature; that the erection of the townships of Plymouth and Jackson, for municipal purposes, did not affect the rights of the proprietors of Plymouth, and that, though the division of Plymouth did not take from the proprietors, whose residence fell into Jackson, any of their corporate rights, yet that they could exercise those rights only under their original act of incorporation.

In this case, it seems that the original incorporation of the proprietors of the township of Plymouth for educational purposes, still continued *in esse,* and that they had had nothing to do, as original incorporators, with any of the subsequent proceedings. If, in the case before us, the original incorporation of the township of Montpelier could have been still considered in force, by implication, the rights of the corporators might doubtless have been exercised and asserted, under their original incorporation.

The effect of the act of 1848, of our legislature, being to abolish the trustee of these funds, created by the charter of 1781, and the act of 1848 being inoperative, to create a valid division of the funds between the two new towns, it must follow that this action cannot be sustained. The new township of Montpelier has no legal interest in the funds vested in them as trustees.

The judgment of the county court is reversed, and the cause remanded.

REDFIELD, CH. J., did not sit in the above case, being interested as a tax-payer in the town of Montpelier.