LAWRENCE C. JONES, ATTORNEY GENERAL, *v.* VERMONT ASBESTOS CORPORATION ET AL.

Special Term at Rutland, November, 1935.

Present: MOULTON, THOMPSON, and SHERBURNE, JJ., and BUTTLES and DAVIS, Supr. JJ.

Opinion filed January 10, 1936.

*Stanley C. Wilson* and *Guy M. Page* for the defendants.

*Lawrence C. Jones,* Attorney General, *pro se* (*Seymour P. Edgerton* and *George F. Jones,* of counsel), for the plaintiff.

MOULTON, J. This is a petition for a declaratory judgment, brought to the court of chancery for Lamoille County, pursuant to the provisions of Chapter 68 of the Public Laws (P. L. 1589 *et seq.*). The defendants severally demurred, and the chancellor by a *pro forma* ruling overruled the demurrers. The defendants thereupon appealed to this court.

This is what is alleged in the petition: The charter of the town of Belvidere granted by the State in 1791 contains the following: ''excepting & reserving to ourselves all gold and silver Mines—And also reserving for public uses the usual quantity of Land reserved in other Townships, chartered by this State, to be laid out at the place of Beginning.'' These public uses included the right for the support of a college or seminary, the ''town school right'' and the so-called ''gospel rights,'' and upon the survey of the township and the allotment thereof lots 162 to 169 inclusive were set apart for these uses, and held in common for them until on or about September 1, 1862. The University of Vermont, a private eleemosynary corporation, was created by an act of the General Assembly, approved November 3, 1791, and by virtue of an act approved November 10, 1802, became vested with full power, right and authority to take charge of, lease, rent and appropriate to its use and benefit all

such lands as had been granted and reserved by the authority of the State for the benefit of a college or seminary, until further order of the Legislature. By a subsequent act, approved November 2, 1810, these rights were confirmed to the University forever.

On September 1, 1862, a committee, acting under authority of an act approved November 2, 1861, divided and set apart the lots 162 to 169 inclusive to the several uses, as follows: To the University of Vermont a ''parcel of land bounded Easterly by the Easterly line of lot number 162, and extending westerly therefrom ninety rods'' in uniform width; ''To the Gospel right a parcel of land next Westerly of the parcel last mentioned and ninety rods in width, being a part of lots 162 and 163,'' fifty rods thereof being in lot 162 and forty rods being in lot 163; ''To the town School right a parcel of land next Westerly from the parcel last mentioned and one hundred rods in width, being a part of lot 163.''

By legislative enactments of 1864 and 1865 a public corporation under the name of the Vermont Agricultural College was created, and by the latter act provision was made for its union with the University of Vermont, both corporations continuing their existence, but together forming a public corporation under the name of University of Vermont and State Agricultural College, which, upon the consent of the constitutent corporations, should have and enjoy the property rights of each of them, including all rights with respect to the rents and uses from the college lands theretofore granted to, or acquired by, the University of Vermont. Consent was given and the University of Vermont and State Agricultural College (which for convenience we will hereafter call the University) became and now is vested with the rights to the college lands conferred upon the University of Vermont by the Acts of 1802 and 1810.

By No. 13 of the Acts of 1831 a part of the town of Belvidere, including lots 162 and 163 was set and annexed to the town of Eden, but neither by this Act or otherwise has the former town been divested of its title to the gospel and school right lands, nor have the rights with respect to the beneficial use thereof been altered, except as will hereinafter appear.

By the terms of No. 65 of the Acts of 1935, the University, as an educational corporation within the purview of the act, is

authorized, upon certain conditions, to convey the college lots by deed in fee simple, to the holders of the perpetual leases thereof. By the terms of No. 239 of the Acts of 1935, the town of Belvidere is authorized, upon certain conditions, to sell and convey to the Vermont Asbestos Corporation by deed in fee simple all or any part of the lands aforesaid reserved for gospel and town school rights.

The Asbestos Corporation is in possession, as lessee under durable leases, of lots 162 and 163, which it holds in perpetuity subject to small annual rents. These lots contain, or are supposed to contain, asbestos bearing rock of great value, and the University and the town of Belvidere have each for good consideration executed and delivered to the Asbestos Corporation an option and right, subject to the authority of the General Assembly and the validity of the two Acts of 1935 above mentioned, to purchase the legal title in fee simple to the college, gospel and school lots now in the possession of the Asbestos Corporation. The price to be paid to the University for the conveyance of the college land is $25,000 less $500 paid for the option; and the price to be paid to the town of Belvidere for the conveyance of the gospel and town school land is $50,000 less $500 paid for the option. The annual rent now paid by the Asbestos Corporation under the durable leases is $25 to the University for the college land, $17.50 to the town of Belvidere for the gospel land, and $17.50 to the town of Belvidere for the town school land.

It is asserted that these lots and each of them ''were originally sequestered to a permanent public use for the benefit of a specified class of unidentified individuals and the right to the use and avails of said lots vested in said class irrevocably, that the Legislature is without right or authority to divest the said rights, title, and interest so vested for the benefit of said class, or to alter, amend, or modify the form in which the corpus of said trust is represented, but on the contrary the beneficiaries of said trust are entitled to have it maintained and preserved in the form in which it was originally granted, and diversion of said corpus of said trust or control thereof constitutes an impairment of the grant and the taking of property for a private use and deprives said beneficiaries of their property, without due process of law.'' Hence it is claimed that No. 65 and

No. 239 of the Acts of 1935 are invalid and inoperative, and
that the University and the town of Belvidere are without right
or lawful power to convey the fee or absolute title of the land
free and discharge from the trust imposed for the indicated
beneficiaries. It is admitted that the rents under the present
conveyances cannot be increased, and that the present income is
less than would be received from the investment of funds real-
ized from the proposed sales under the options, if properly safe-
guarded; but it is alleged that such funds would be less secure
than the ownership of the rents and uses of the land, and that
the two Acts of 1935 above mentioned do not make adequate
provision for the proper control and preservation of avails of
the sale.

The petitioner represents that as Attorney General of the
State of Vermont, he is entrusted with the protection of, and is
bound to assert the rights of the undetermined beneficiaries of
the trust. Wherefore he prays for a decree which shall declare:
(1) That the General Assembly has no power or right to
authorize the conveyance of the fee simple in the college, gospel
and town school lands, or any of them, in manner and form as
provided in Nos. 65 and 239 of the Acts of 1935; (2) that
neither the University nor the town of Belvidere has the power
or right to enter into and perform the option contracts; (3) that
the Asbestos Corporation has no power or right to acquire the
title in fee simple to the above mentioned lands; and (4)
‘‘what, if any, right, title or interest in said lands or any rents,
issues, profits, produce, gold, silver, or other mineral arising
out of or produced from said lands, the State of Vermont or the
people thereof, or the University of Vermont, or the University
of Vermont and State Agricultural College or the Town of
Belvidere, or any of the classes of beneficiaries of said trusts in
lands, will have or retain after conveyance under said acts and
options.’’

The material parts of the two statutes involved may be noted
at the outset. No. 65, Acts of 1935, sec. 1, provides that ‘‘Edu-
cational corporations may convey by deed the fee simple in
lands the title to or use of which is held by such corporations
under grant from the state for purposes defined in said grants.
Such conveyance may be made to the owner and holder of lease-
hold rights in such land if such lands are then held under lease,

but shall not be made to other than such holders of leasehold interests except subject to such leasehold interest, if any, or simultaneously with the extinguishment thereof. The funds received in consideration of such conveyance shall be kept intact, in trust, by such corporation as endowment funds, and the income only shall be used for the purposes for which said lands were originally granted. No. 239 of the Acts of 1935 runs thus: "Section 1. The Town of Belvidere is hereby authorized and empowered at any time within two years from the passage of this act to sell and convey by deed the fee simple in all or any part of the lands heretofore granted and reserved by the State in the charter of said town dated the 4th day of November, 1791, for gospel rights and for the town school right for said town of Belvidere and thereafter set out to said rights by special commission * * * and lying and being in lots 162 and 163 of the original survey of said town of Belvidere * * *. Sec. 2. Such conveyance may be made to the owner and holder of leasehold rights in such land, but shall not be made to other than such holders of leasehold interests except subject to such leasehold interests, if any, or simultaneously with the extinguishment thereof. Power to fix the consideration for such sale and do any and all things necessary and appropriate to effectuate such conveyance and extinguishment is hereby vested in said town of Belvidere, acting by and through its selectmen. Sec. 3. The funds received from such sale or sales, after deducting the expenses incident to the same, shall be held as a trust fund by said town of Belvidere and properly invested and the income therefrom only shall be used for the purpose for which said rights or lots were originally respectively reserved and dedicated. The said selectmen shall determine the proper and equitable portion of said fund and the income from the same which shall be apportioned to the support of the gospel and to the support of the town schools."

 By the reservation of the public rights in the charter of the Town of Belvidere no title thereto passed to the original proprietor of the town. *Grammar School* v. *Burt,* 11 Vt. 632, 639; *Victory* v. *Wells,* 39 Vt. 488, 494. Since the lands were, before the charter, under the control and disposition of the General Assembly of the State, the reservation was, in effect, a grant or dedication to public uses. *Pawlet* v. *Clark,* 9 Cranch,

292, 330, 3 L. ed. 735, 749. *Montpelier* v. *East Montpelier*, 27 Vt. 704, 708. The title to the "gospel lands," or "lands for the support of the social worship of God," and the "school lands" thereby became vested in the municipality as trustee for the purposes to which the lands were devoted. *Capen's Admr.* v. *Sheldon*, 78 Vt. 39, 46, 61 Atl. 864; *White* v. *Fuller*, 38 Vt. 193, 200; *Town of Montpelier* v. *Town of East Montpelier*, 27 Vt. 704, 708; *Id.*, 29 Vt. 12, 18, 67 A. D. 748. It was held in *City of Maysville* v. *Wood*, 102 Ky. 263, 49 S. W. 403, 39 L. R. A. 93, 80 A. S. R. 355, that municipal corporations cannot hold as trustee for religious purposes, this being foreign to the purpose for which they were created and being a matter in which they have no interest, but our law has been otherwise from the earliest times. See *Pownal* v. *Myers*, 16 Vt. 408, 413.

██ The university derives its title to the college or seminary lots from its original charter, which empowered it "to take charge of, lease, rent, and improve to the best advantage all such grants as have been already made by the authority of this state for the use and benefit of a college" (Rev. St. 1787-1791, p. 300, passed November 2, 1791) ; from chapter 95, sec. 1, Acts of 1802, which conferred authority "to take charge of, lease, rent, and appropriate to the use and benefit of the University of Vermont, all such lands as have been already granted and reserved, by the authority of this state, for the use and benefit of a college, or for the use and benefit of a seminary or college, and the same to continue until the further order of the Legislature"; and from chapter 83, sec. 8, Acts of 1810, by which it was "invested with full power, right, and authority to take charge of, lease, rent, and appropriate to the use and benefit of the said University forever, all such lands as have been already granted and reserved by the authority of this State, for the use and benefit of a college, or for the use and benefit of a seminary or college." By the statute by which the University of Vermont and the State Agricultural College were united and made a body corporate (No. 83, sec. 4, Acts of 1865) the trustees were given the same rights to the lands and the rents and uses thereof as had previously been conferred upon the University of Vermont. See *University of Vermont, etc.* v. *Ward*, 104 Vt. 239, 245, 246, 158 Atl. 773. There is, it may be remarked, no provision in the Belvidere charter for a future power of control in the General

Assembly over the college lands in the town, as there is in the charter of Morristown, as appears in the Ward case, *supra*, p. 248, and these lands were originally reserved to the town. The charter of the University of Vermont antedated by one day the charter of the town of Belvidere, but the title granted to the University by its charter to the college lands covered only such lands as had been previously reserved. By the statutes above quoted a change was made in the trusteeship of the college lands in Belvidere—the University was submitted for the town, although the purpose of the trust was unchanged. If the consent of the town was necessary to the validity of this innovation (see *Poultney* v. *Wells*, 1 Aik. 180, 186; *Montpelier* v. *East Montpelier*, 27 Vt. 704, 711; *Id.*, 29 Vt. 12, 19, 67 A. D. 748; *Fletcher* v. *Rutland & B. R. R. Co. et al*, 39 Vt. 633, 647-649), it is inferable from the lapse of time and long continued acquiescence in the arrangement. It is plain that the college lands reserved by the charter of the town of Belvidere are now held by the University in trust for the purposes of the grant.

██ ██ In the case of the gospel and school lands thus held in trust by the town, the beneficiaries have been held to be the present and future inhabitants of the town, *Lampson* v. *New Haven*, 2 Vt. 14, 16; *Montpelier* v. *East Montpelier*, 27 Vt. 704, 708; *Id.*, 29 Vt. 12, 18, 67 A. D. 748, or the legal voters of the town. *Pownal* v. *Myers,* 16 Vt. 408, 413. Perhaps it would be more accurate to say that the beneficiaries are those present and future inhabitants of the town who join in social worship or avail themselves of the educational advantages offered by the town schools, although it has been held that since the income from the school lands has the effect to reduce the funds necessary to be raised by taxation for the support of the schools, every tax-payer has a beneficial interest therein. See *Trustees of New Gloucester School Fund* v. *Bradbury,* 11 Me. (2 Fairfield) 118, 26 A. D. 515, 519. In the case of the college lands, held in trust by the University, the beneficiaries include "all persons now living or who may be born hereafter who are or who may be entitled to become students at the institution." Scott, "Education and the Dead Hand," 34 Harvard Law Rev. 1, 6; *Dartmouth College* v. *Woodward,* 4 Wheat. 518, 642, 4 L. ed. 629, 660.

■ The petitioner herein takes the position that, since voluntary trusts have been created, without an express power of revocation or modification, the corpus cannot be changed without the consent of all the parties interested, including the beneficiaries.

■ If this were a case involving a private trust there would be force in this contention. *O'Brien* v. *Holden,* 104 Vt. 338, 347, 160 Atl. 192. There is, however, no doubt that these lands are held to public charitable uses. The purposes of the grants are educational and religious. *In re Downer's Estate,* 101 Vt. 167, 172, 173, 142 Atl. 78. There is no question of private gain, profit, or advantage. *Brattleboro Retreat* v. *Town of Brattleboro,* 106 Vt. 228, 236, 173 Atl. 209. The benefits are conferred upon an uncertain and indefinite number of persons (*Boyce* v. *Sumner,* 97 Vt. 473, 478, 124 Atl. 853), and ''A public charity begins where uncertainty in the recipient begins.'' 2 Perry on Trusts and Trustees (7th ed.), par. 687; Zollman, Charities, pars. 353-355, and see *McAlister* v. *Burgess,* 161 Mass. 269, 271, 37 N. E. 173, 24 L. R. A. 158. Their interests are shifting. *Old South Society* v. *Crocker,* 119 Mass. 1, 23, 20 A. R. 299. ''A gift is a public charity when there is a benefit to be conferred on the public at large, or some portion thereof, or upon an indefinite number of persons. *Burbank* v. *Burbank,* 152 Mass. 254, 256, 25 N. E. 427, 428, 9 L. R. A. 748. The grants are unlimited as to time, and this feature, while permissible and proper in the case of a charitable trust, would render a private trust void by the application of the rule against perpetuities. *Sherman* v. *Baker,* 20 R. I. 446, 40 Atl. 11, 12, 40 L. R. A. 717; *Merrill* v. *American Baptist Missionary Union,* 73 N. H. 414, 62 Atl. 647, 650, 3 L. R. A. (N. S.) 1143, 111 A. S. R. 632, 6 Ann. Cas. 646; *Odell* v. *Odell,* 10 Allen (Mass.) 1, 6; *MacKenzie* v. *Trustees of Presbytery, etc.,* 67 N. J. Eq. 652, 61 Atl. 1027, 1034, 3 L. R. A. (N. S.) 227; *Mills* v. *Davison,* 54 N. J. Eq. 659, 35 Atl. 1072, 1073, 35 L. R. A. 113, 55 A. S. R. 594; *Perin* v. *Carey,* 24 How. 465, 16 L. ed. 701, 708; *Jones* v. *Habersham,* 107 U. S. 174, 27 L. ed. 401, 406, 2 Sup. Ct. 336; *Ould* v. *Washington Hospital,* 95 U. S. 303, 24 L. ed. 450, 452. Thus all the elements that distinguish a public charitable trust from a private trust are present.

 The inherent jurisdiction of the court of chancery to administer charitable trusts is ancient and well settled, antedating the statute of 43 Eliz. ch. 4 (1601), as clearly appears from the exhaustive and scholarly opinion of Williams, C. J., in *Exrs. of Burr* v. *Smith,* 7 Vt. 241, 291-311, 29 A. D. 154. See also Merwin, Equity and Equity Pleading, par. 344. This jurisdiction applies whether the trust *res* is derived from private donation or gift from the Legislature. Perry, Trusts and Trustees (7th ed.), par. 707; *Attorney General* v. *Heelis,* 2 Sims and S. 67, 76. It has been held to extend to the authorization of a sale of the property where, although the object of the trust is still existent, the possession of the particular estate has become no longer suitable for the purposes to which it was originally devoted, and its alienation is essential to the beneficial administration of the charity, the avails of the sale to remain subject to the charitable intention of the donor. *Town of South Kingston* v. *Wakefield Trust Co.,* 48 R. I. 27, 134 Atl. 815, 817, 48 A. L. R. 1122; *Brice* v. *Trustees of All Saints Chapel,* 31 R. I. 183, 76 Atl. 774; *Weeks* v. *Hobson,* 150 Mass. 374, 380, 23 N. E. 215, 6 L. R. A. 147; *Rolf, etc., Asylum* v. *Lefebre,* 69 N. H. 238, 45 Atl. 1087, 1089; *Attorney General* v. *South Sea Co.,* 4 Beaven 453, 458, 49 English Reprint 414. This power should be used with caution (*Rolf, etc., Asylum* v. *Lefebre, supra*), but may be exercised even where the donor of the charity has expressly forbidden alienation. *Jones* v. *Habersham,* 107 U. S. 174, 183, 27 L. ed. 401, 2 Sup. Ct. 336; *Amory* v. *Attorney General,* 179 Mass. 89, 105, 60 N. E. 391 (per Holmes, C. J.); *Smart* v. *Town of Durham,* 77 N. H. 56, 86 Atl. 821, 823.

 But the general jurisdiction of the court of chancery over charitable trusts is not invoked in this proceeding, and hence the question whether it extends to the particular situation before us need not be considered. It is the power of the Legislature to authorize a sale in the manner prescribed by the statute that is in issue. The power of the State unrestrained by the 14th Amendment or the contract clause of the Federal Constitution (art. 1, sec. 10) extends over the property of municipal corporations held and used for governmental purposes. *City of Trenton* v. *New Jersey,* 262 U. S. 182, 183, 67 L. ed. 937, 43 Sup. Ct. 534, 536, 29 A. L. R. 1471; *Covington* v. *Kentucky,* 173 U. S. 231, 241, 43 L. ed. 679, 683, 19 Sup. Ct. 383. But the

principal is not applicable to lands held in trust for educational or religious purposes. *Montpelier* v. *East Montpelier*, 29 Vt. 12, 18, 67 A. D. 748. The power, if it exists, must be sought elsewhere.

 That a certain control has previously been exercised by our Legislature over the public lands reserved for religious and educational purposes, and the administration of the trusts upon which they are held cannot be doubted. By an act of October 3, 1797, the school trustees of each town were given authority "to lease the estate * * * and to take leases, bonds, or other securities, to themselves and successors for the use of such schools" the income from the leases of school lands to be divided equally between the several town school districts. Laws of 1808, Vol.II, ch. LXXXXVI, No. 1, sec. 1. By No. 20 of the Acts of 1892 each town was constituted a single school district and the division of the town into school districts was abolished; and this enactment was held in *Town of Barre* v. *School District*, 67 Vt. 108, 112, 30 Atl. 807, to effect a change of trustees, the Legislature having the right and power to change the agencies it had created. And today; by P. L. 3536 the town selectmen have the care of school lands, and by P. L. 3538 are given authority to lease them as they deem beneficial, the rents to be paid annually into the town treasury. The legislation regarding the gospel lands follows the same general course. By act of November 3, 1798, selectmen were authorized "to take care of, and lease out, all the lands, in their respective towns, granted to the use of the ministry or the social worship of God, and still remaining to such use" with the proviso that the term of the lease should not exceed fifteen years. Laws of 1808, Vol. I, ch. XVII, No. 4, sec. 2. One week thereafter, however, on November 10, 1798, the proviso was repealed and the selectmen were authorized to lease said lands "for any term of time; and in such manner, and under such restrictions, as the inhabitants of such towns, at a meeting legally warned for that purpose, shall direct." *Id.*, No. 6, sec. 2. By act of November 9, 1818, the necessity of a town meeting was removed, and the selectmen given the sole authority. Acts of 1818, ch. XVI, sec. 1. P. L. 3536 and 3538, above mentioned, apply also to gospel lands. Other legislation relating to glebe lands and lands reserved for the first settled minister is similar in nature but need not be

94

specially noticed. As we have seen, by the charter of the University and the subsequent acts of 1802 and 1810, varying and increasing powers over the college and seminary lands were conferred upon it, and by the Act of 1865 these rights were confirmed to the trustees of the new body corporate formed by the union of the University of Vermont and the State Agricultural College.

. Although there is no specific prohibition of complete alienation in our Constitution or in any statute, it has been the law of this State from the earliest times that an attempted conveyance of the fee of public lands is void. *Bush* v. *Whitney*, 1 D. Chip. 369, 370; *Lampson* v. *New Haven*, 2 Vt. 14, 16, 17; *Williams* v. *Goddard*, 8 Vt. 492, 500; *Society for the Propagation, etc.* v. *Sharon*, 28 Vt. 603, 616; *Capen's Admr.* v. *Sheldon*, 78 Vt. 39, 47, 61 Atl. 864; *Trustees of Caledonia County Grammar School* v. *Kent*, 86 Vt. 151, 157, 84 Atl. 26; *Executors of Judevine's Est.* v. *Trustees of Caledonia County Grammar School*, 93 Vt. 220, 237, 106 Atl. 836. The authority conferred upon the towns and the university by statutes above mentioned, to lease the lands has been, by decisions of this court, construed to include the power to execute so-called "durable leases," that is, conveyances of the "as long as grass grows and water runs" variety, with covenants for rent and reservations of a right of re-entry for breach of condition. *White* v. *Fuller*, 38 Vt. 193, 205; *Lampson* v. *New Haven*, 2 Vt. 14, 19. In *University of Vermont* v. *Ward*, 104 Vt. 239, 158 Atl. 773, it was held by a majority of this court, the present writer dissenting, that these conveyances, when given with regard to public lands, were leases, the parties thereto standing in the relationship of landlord and tenant, and that the rule forbidding a conveyance of such lands in fee extended to the transfer of a conditional fee. But this is immaterial for present purposes. Conveyances of "durable leases" have heretofore marked the limit of permissible alienation. The authority of the town and university has been curtailed to this extent. The effect of the two acts of 1935, now in question, is to remove this restriction, and to permit the conveyance of a fee simple absolute. The powers of the trustees of these public lands, hitherto circumscribed, have been enlarged.

All of the prior enactments have been directed only to the administration of the trust. The *res* has been kept intact. The legislation now under consideration provides a method for the destruction of the *res,* and the substitution of another *res* in its place. This is, however, only to be effected by the consent of the trustees or those persons representing them. The statutes are not mandatory; they are permissive. An examination of the decisions of other states (for we have none of our own) will make clear the extent of the legislative authority.

*Clarke, Ex'r* v. *Hayes,* 9 Gray (Mass.) 426, was a bill in equity for the specific performance of an agreement for the purchase of certain real estate, which had been devised to the plaintiff and others as executors upon trust to pay the income to the testator's sons for life and upon the decease of the survivor to convey the land to their heirs. By a resolve of the Legislature the plaintiff as surviving executor, had been authorized, upon giving bond, to sell and convey the property in fee simple, free and discharged from the trust, and to invest and hold the net proceeds of the sale in the same manner as provided in the will in trust for those entitled thereunder to the benefit of the original devise. There was a demurrer on the ground that the action of the Legislature was without constitutional authority. The Court said (p. 428) : "It is certainly well settled that property held in trust * * * is not absolutely uncontrollable, nor necessarily to be preserved unchanged in the same form and condition in which it was when it was first received under the original grant or devise. By the authority of the Legislature and under suitable restrictions, it may be sold or otherwise disposed of, if adequate provision is made to secure the rights of all persons and parties who already have or may afterwards become entitled to an interest in it, and in such manner that whatever is received in exchange or compensation for it shall be substituted in its place, and be impressed with the same obligations and devoted to the same ends, purposes, and use." The demurrer was overruled.

In *Welch* v. *Silliman,* 2 Hill (N. Y.) 491, it appeared that a statute of 1802 (Laws 1802, p. 198) directed the commissioners of the land office to grant letters patent to Talmadge, in trust for Welch, for 450 acres of unappropriated land, and provided that Talmadge should sell the land for not less than $2.50 an

acre, and should apply the proceeds for the support of Welch and his family, and after his decease pay the residue, if any, to Welch's legal representatives. The letters patent were issued, and, since it became evident that the indicated price was too high, a statute of 1805 (Laws 1805, p. 126) was passed providing that the sale should be made at Talmadge's discretion, for such price as could be obtained. The land was sold in accordance therewith, and thereafter Welch brought ejectment against the purchaser, claiming the invalidity of the latter act. The court said (p. 493) ''The grant under the act of 1802 was a bounty from the State, to which it had a right to annex such restrictions and conditions as the Legislature saw fit. Accordingly, the exclusive power of sale was conferred upon the trustee, fixing the minimum price per acre. So far, the grant was a qualified one. Neither the trustee nor the *cestui que* trust, nor both together, could have aliened without observing the restriction thus imposed. The subsequent act of 1806 simply removed this limitation, and conferred upon the trustee full power of disposition. Instead of interfering prejudicially with any vested interest or estate which Welch acquired in the premises under the former act, it confirmed and enlarged that already granted, by turning a qualified power of alienation into an absolute one. It was a new and additional gift to the one already made by virtue of the act of 1802; or in other words, a release by the donor to the donee, of a condition annexed to a previous grant.'' The act of 1805 was held valid.

It will be observed that the trusts involved in the cases just mentioned were private in nature. But the reasoning of the decisions, particularly of the latter, is applicable here. In the case in hand there was no expressed restriction to the grants to the town and the University, yet a restriction existed by the law of the State, for an absolute alienation was prohibited, the right to convey being qualified to the extent which we have hereinbefore noticed.

*Stanley* v. *Colt*, 5 Wall. 119, 18 L. ed. 502, involved a testamentary trust of real estate for religious purposes which contained a provision that the estate should never be sold or disposed of, or divided. The Connecticut statute in force at the time provided that lands so granted ''shall forever remain in and be continued to the use or purposes,'' designated in the gift

"and to no other use whatsoever." Later the Legislature, without notice to the heirs at law of the testator, upon the application of the religious society and the trustees appointed by the will, enacted that the trustees should have power to sell and convey the land "and such parts thereof as may from time to time be advantageously sold, and to execute good and sufficient deeds thereof, in fee simple," the proceeds to be invested and held by the trustees subject to the trust. The sale was made and the heirs at law, claiming its invalidity, brought ejectment against the purchaser. The court upheld the statute authorizing the sale, saying (5 Wall. 119, 170, 18 L. ed. 503, 510) "We cannot doubt that the power exists in the Legislature, and it is not for this court to revise the facts upon which it has seen fit to exercise."

The Supreme Court of Connecticut, in *Bridgeport Public Library* v. *Burroughs Home,* 85 Conn. 309, 82 Atl. 582, a case involving a legislative resolution which empowered the trustees of a public library to sell and convey the real estate which had been devised for the use of the institution, declined to follow *Stanley* v. *Colt, supra,* upon the ground that the latter decision assumed that the power to authorize the sale was a chancery power, and this power, it was held, was not possessed by the Connecticut Legislature, the court being alone competent to confer the authority. However, it was said (p. 585 Atl.) that the decision in *Stanley* v. *Colt, supra,* "removes from the field of discussion any question as to the existence of a power in the sovereignty of the State fully adequate to bestow upon trustees administering a public charitable trust authority as to its administration, such as the General Assembly attempted to confer in the present instance."

But that this power does not inhere only in the court of chancery has been held in several decisions. It is said in *Shields* v. *Harris,* 190 N. C. 520, 130 S. E. 189, 192: "The Legislature, or a court of equity may authorize a sale of charitable trust property under the needs arising from the exercise of police power by that division of government having jurisdiction of the *locus in quo.*" See also *Grace Church* v. *Ange,* 161 N. C. 314, 77 S. E. 239, 240. And in *Old South Society* v. *Crocker,* 119 Mass. 1, 26, 20 A. R. 299: "We cannot doubt that the lands so held [as public charity] may be sold by authority of the Legis-

98

lature.'' While the Legislature's constitutional power to terminate a charitable trust was said to be open to grave doubt, it was held in *Crawford* v. *Nies*, 220 Mass. 61, 107 N. E. 382, 383, that ''the power of the Legislature to authorize the sale of a particular piece of land free from trusts for the maintenance of a building for religious worship created by its original deed of conveyance to religious uses, may not be doubted.''

The fact that, in some cases, the Legislature has delegated to the courts the power to authorize the sale of trust property does not make it a judicial function. *Rice* v. *Parkman*, 16 Mass. 326, is in point. A resolve of the Legislature authorized the sale and conveyance of the lands of certain named infants, and provided that the avails should be placed at interest with good security for their benefit. The court, speaking through Parker, C. J., said (pp. 329, 330), that, if the power by which the resolve was passed was of a judicial nature, it would be very clear that it could not have been constitutionally exercised by the Legislature. ''But it does not follow that, because the power has been delegated by the Legislature to courts of law, it is judicial in its character. * * * It is doubtless included in the general authority, granted by the people to the Legislature in the constitution.'' And in *Tindal* v. *Drake*, 60 Ala. 170, 177, 178, the power of the Legislature to direct the sale of lands of infants, and the reinvestment of the proceeds in other property deemed more advantageous was held not to be an invasion of the judicial power, but a legitimate exercise of the appropriate functions of the Legislature.

Since, therefore, the General Assembly possesses general power to authorize the conveyance of the public lands in question our next inquiry is whether it can do so without the consent of the beneficiaries of the trusts, whose identity we have already mentioned. It must be kept in mind, in the consideration of this question, that the General Assembly is the donor and creator of the trust; that the previous title of the trustees was not unrestricted; that the trustees have consented to the sales by the execution of the options; and that the purposes and objects of the trusts are not modified or changed.

No judicial support for the proposition that the consent of the beneficiaries of a public charity is requisite to the validity of a sale of the trust property, under legislative authorization

with provision that the proceeds shall be held subject to the trust in the place of the property sold, has been called to our attention. The decisions upon which the petitioner relies do not go to this extent. *Pownal* v. *Myers*, 16 Vt. 408, involved the construction of a deed to a town "in trust, the rents and profits to go and be disposed of to and for the use and support of a gospel minister, or ministers, in the eastern and western part of the town, in proportion to the number of inhabitants attending or inclined to each respective meeting." The trial court held that this conveyance was not a public trust but a private grant, subject to modification with the consent of the donor, and that his consent would, after thirty years be presumed. In affirming the judgment, the Supreme Court, speaking through Redfield, J., said (p. 414) : "The trustee may convey with the consent of the *cestui que* trust and the founder of the trust, or charity, in all cases. This is of the very nature of all trusts, or charities, and indeed, of all contracts, that the scheme may be modified by the consent of all concerned. And it must also follow that this assent may be either express, or implied. This implication may result either from circumstances or from lapse of time, or from both." We may well doubt the correctness of the ruling of the trial court that this was not a public trust (see *Burbank* v. *Burbank*, 152 Mass. 254, 256, 25 N. E. 427, 9 L. R. A. 748), but the Supreme Court evidently adopted this view and treated it as a private grant at least for the purposes of the case. The point in issue was not whether the consent of the beneficiaries to the sale was essential, for this appeared by a vote of the town, but whether the consent of the donor could be presumed. The decision is far from being an authority to the effect that the consent of the beneficiaries of a public charitable trust must be obtained before the trust property can be sold. In *Poultney* v. *Wells*, 1 Aik. 180, it appeared that a part of the town of Wells had been annexed to the town of Poultney by an act of the Legislature which provided that the latter town should be "entitled to such part of the rents, profits, and privileges, of all the public lands in the town of Wells, as shall be in proportion to the quantity of lands in and by this act annexed to the town of Poultney as aforesaid." The controversy, as far as is here material, arose over a portion of the rents from the school lands of Wells, to which Poultney claimed to be entitled

under the act. The court held that the act had undertaken to give to Poultney a portion of the income of the right, which would be unavailing without the consent of Wells, and said (p. 186), "that the school right, thus appropriated by the charter, belongs to the town of Wells; so that the Legislature can exercise no power over it, to vary this appropriation, without the consent of the town, and this consent must be by those who are inhabitants of the town, at the time the assent was given. Assent, in this case, was presumed. But what the court was speaking about was not the land but the income from it, which obviously could not be diverted, or partly diverted, from the purposes for which the grant was originally made without destroying the trust to the extent of such diversion. It was not the substitution of one form of property for another, the objects of the trust remaining unchanged. So, too, in *White* v. *Fuller*, 38 Vt. 193, 201, in speaking of the same lands that are involved in the instant case. "The Legislature could not have made any change in the appropriation of the rents or use of the town school right without the consent of the town of Belvidere." In other words, the Legislature was powerless to change the object of the trust, under the circumstances, by applying the income to some other purpose. In *Humphry* v. *Whitney*, 3 Pick. (Mass.) 158, it appeared that the charter of a township reserved a share for the ministry which was duly laid out. A clergyman of the Congregational order was settled and ordained as the first minister, and entered upon and occupied the share. Later on, at a town meeting, it was voted that the share should be sold, and the proceeds kept as a fund for the Congregational and Protestant Episcopal societies of the town, $\frac{4}{5}$ for the support of the ministers of the former, and $\frac{1}{5}$ for the support of the ministers of the latter. The Legislature was petitioned to sanction this arrangement, but before it was passed upon, another town meeting was held at which, upon the report of a committee, it was voted to vary the proportions of the income between the two societies. Thereafter the Legislature passed a resolve authorizing the sale of the share, and the placing of the proceeds at interest to be applied in accordance with the vote of the town last mentioned, but with a proviso that it should be in the power of the Legislature, upon application of any denomination of Christians, having a settled minister in the town, to make

a new appropriation of the income. Some years thereafter, on application by the ministers of the two societies and the selectmen of the town, the Legislature passed a resolve repealing the proviso, and confirming the appropriation of the fund and income. The plaintiff who was the Protestant Episcopal minister, and the successor in office of the first minister of that order to be settled in the town, brought suit to recover his share of the income under the vote of the town and the resolve of the Legislature from the defendant, the treasurer of the town, and of the Congregational parish, who held the fund. The defense denied the validity of the vote and resolve, and asserted a right to the entire fund in the parish as the lawful successor to the original grantees of the land. In holding that the plaintiff was entitled to recover, the court said (p. 164), that, "with the consent of the parties legally and equitably interested in the grant, a legislative act will avail to enable these parties to carry into effect just and honest intentions in relation to the property, preserving the original purpose and object of the grant. * * * An act relating to this property, founded on the consent of all these parties, and which does not change the use and application of the property, but distributes its income equally between two religious societies formed out of the inhabitants of the town, cannot we think be unconstitutional." The point in issue was not the sale of the ministry share, but the application of the proceeds. The question was whether it could be used, by legislative authority based upon the consent of those interested, for the support of two ministers of different denominations, instead of the support of the one first settled minister as originally intended by the grant.

*Old South Society* v. *Crocker*, 119 Mass. 1, 20 A. R. 299, did not involve a public charity, as is pointed out on page 25 of the opinion. Neither did *Sohier* v. *Trinity Church*, 109 Mass. 1. For this reason these cases are not in point. Other cases cited by the petitioner are also distinguishable.

██ ██ Where the Legislature authorizes a sale of the property of infants or other persons not *sui juris*, it does so in its capacity as *parens patriae*. *Petition of Post*, 13 R. I. 495, 498, 499; *Rice* v. *Parkman*, 16 Mass. 326, 331. The same principle applies in the case of a public charity. *Trustees of Sailor's Snug Harbor* v. *Carmody*, 144 N. Y. S. 24, 144 App.

102

Div. at p. 738. As to those persons who may hereafter become entitled to the benefits of the trust, there is a want of capacity to manage and preserve the property, and hence the necessity of devolving this duty upon the sovereign represented by the Legislature. *Brevoort* v. *Grace,* 53 N. Y. 245, 252, 253.

We are of the opinion that the two statutes of 1935 were within the competency of the General Assembly to enact; that they were in effect the act of the donor of the trust removing a restriction from the grant, and giving power and authority to the trustees, in one case the University, in the other the town acting through its selectmen, to deal with the property in a manner hitherto prohibited, if, in their discretion they should decide that it would be for the advantage of those entitled to its benefits to do so. There is no destruction or modification of the purposes and objects of the trust. The consent of the selectmen is the consent of the town, as trustee; and nothing more is necessary. It is not argued that the consent of the students at the University, or those at the town schools is required, with regard to the college or school lands. The potential rights of such students "are, in the aggregate, to be exercised, asserted and protected by the corporation," and are "incapable of being asserted by the students." *Dartmouth College* v. *Woodward,* 4 Wheat. 518, 643, 4 L. ed. 629, 660. The late Chief Justice Doe of New Hampshire ("The Dartmouth College case," 6 Harv. Law Rev. 161, 170) has said that, taken in its comprehensive sense, this language is misleading and that if the trustees of a college should, under express statutory provisions, unanimously vote to divert the trust fund from the use intended by the donors, the students, as plaintiffs in interest, would be found to have rights which the law would protect. But here, as we have pointed out, the purposes of the trust are not changed. The decision in the Dartmouth College case was placed upon the ground of lack of consent by the trustees of the college. "It is submitted," says Professor Scott ("Education and the Dead Hand," 34 Harv. Law Rev. 1, 18), "that if the trustees had consented there would have been no impairment of the obligation of contracts, no arbitrary taking of property without due process of law, or contrary to the law of the land, no exercise by the Legislature of judicial power."

■ As for the claim that the Legislature has failed properly to provide for safe investment of the funds received from the sales so that they may be kept from depreciation or loss, all that need be said is that this was a matter for the General Assembly to decide. "If the Legislature possesses the power, it also has the power to determine whether the case presented is one proper for its exercise, and its determination is conclusive, as also of the mode and safeguards under which it shall be exercised." *Brevoort* v. *Grace,* 53 N. Y. 245, 251. It is enough if the General Assembly, acting according to its judgment, in view of the existing facts comes fairly to the conclusion that the conversion will be for the benefit of those entitled. *Petition of Post,* 13 R. I. 495, 499, 500; *Stanley* v. *Colt,* 5 Wall. 119, 18 L. ed. 502, 510. That this will be so in the instant case is reasonably apparent, for the annual income to be expected, even in these days of low return, from the investment of the respective sums of $50,000 and $25,000 will far exceed the present annual rents of $35 and $25, which can never, so long as the present conveyances are in force, be increased. The wisdom of the Legislature in abolishing this species of mortmain is not open to question.

We are asked to say what right, title or interest in "gold, silver or other mineral arising out of or produced from said lands the State of Vermont or the people thereof" will have or retain after conveyances under the acts of 1935, and the option given for such conveyances. Unfortunately this issue has not been briefed by either side, and no reference was made to it upon argument, so we are left without the assistance which might have been afforded us. But since a full and complete answer to the questions involved in the proceedings cannot be given without taking this matter into account, we give it our consideration.

■ P. L. 8208 provides that: "All mines or quarries discovered or hereafter to be discovered upon any public land belonging to the people of the State * * * are the property of the people of this state in their right of sovereignty." P. L. 8209, 8210 and 8211 prescribe the conditions upon which such mines or quarries may be worked by a citizen of the United States. If the lands here in question come within the description of "public land belonging to the people of the State," these sections will cease to have any application because, after the sale,

the property will be of a private nature and no longer public land. The Vermont Asbestos Corporation, as the possessor of the surface of the soil will be deemed to be in possession of whatever lies underneath the surface, since land includes not only the ground or soil, but everything attached to it above or below, in accordance with the maxim *cujus est solum, ejus est usque ad coelum. Stratton v. Lyons,* 53 Vt. 641, 643.

But there is this qualification: The charter of the town of Belvidere contains the provision "excepting & reserving to ourselves all gold and silver Mines." These words constitute an exception to the grant contained in the charter. The gold and silver mines in the town (in the improbable, but evidently hoped for, event that such existed) did not pass either to the original proprietor or to the municipality for public uses, but the title thereto remained in the State, the grantor of the charter. *Roberts v. Robertson,* 53 Vt. 690, 692, 38 A. R. 710; *Dee v. King,* 77 Vt. 230, 233, 59 Atl. 839, 68 L. R. A. 860. A mine, in its primary and restricted meaning, is underground excavation, made for the purpose of extracting minerals. *Greene County v. Lattas Creek Coal Co.* (Ind. App.), 96 N. E. 633, 637; *People ex rel. v. Bell,* 237 Ill. 332, 337, 86 N. E. 593, 19 L. R. A. (N. S.) 746, 15 Ann. Cas. 511. In a broader sense the word is used to describe a deposit of such material suitable for excavation and working. *Northern Pac. R. Co. v. Mjelde,* 48 Mont. 287, 298, 137 Pac. 386. It was in the latter sense that the word was used in the charter, for it is incredible that, at the date of the grant (1791) there were, in the wild lands comprised within the boundaries of the town, any excavations for the purpose of obtaining either of the two precious metals.

That the title to any deposits of gold and silver was, prior to the charter, in the State cannot be doubted. At common law such mines belonged to the king, by his prerogative, as mines royal, and could become the property of a subject only by a grant from the king in "apt and precise words," although mines of other minerals belonged to the proprietor of the soil. *The Case of Mines (Reg. v. Earl of Northumberland* [10 Eliz. Hil. Term]) Plowden, 310, 336, 17 Eng. Rul. Cases 393, 399, 400; 1 Blackstone Commentaries, 294. Perhaps it was with this principle in mind that the charter of the town of Belvidere was made to contain the exception. The question is academic, but

not without interest. See Kent, Commentaries, vol. 3,*378, note (b) (9th ed.) However, as the last named writer says, on the page cited, ''It is a settled and fundamental doctrine with us, that all valid individual title to land within the United States is derived from our own local governments, or from that of the United States, or from the Crown or royal chartered governments established here prior to the Revolution.'' Thus, the right to make the exception to the grant contained in the charter is clear. The permission, contained in the two statutes of 1935, to convey a title in fee simple is no more than the authorization of the transfer of such an estate in the property as was passed to the grantees by the charter, and this did not include the hypothetical gold and silver mines. Mines may form a distinct possession and different inheritances from the surface. *Riddle* v. *Brown*, 20 Ala. 412, 56 A. D. 202, 203; cas. cit. note 63 A. D. 100-101.

We hold and declare, therefore:

(1) That the General Assembly has the right and power to authorize the conveyance in fee simple of the college and town school rights, and gospel rights, or any of them, in manner and form as provided in Nos. 65 and 239 of the Acts of 1935.

(2) That the University of Vermont and State Agricultural College and the town of Belvidere, or either of them, have the power and right to enter into and perform the contracts of option hereinbefore referred to.

(3) That the Vermont Asbestos Company has the power and right to acquire title in fee simple to the rights hereinbefore mentioned.

(4) That under the conveyances under said acts and options the State of Vermont, or the people thereof, will have and retain the right, title, and interest in and to whatever gold and silver mines may now be known to exist, or may hereafter be found to exist, within the boundaries of said lands, but no other right, title or interest in or to said lands or the rents, profits, issues, produce, and minerals, other than gold and silver, arising out of or produced therefrom; that the University of Vermont, or the University of Vermont and State Agricultural College, or the town of Belvidere or any of the classes of beneficiaries of the trusts in said lands, will have and retain no right, title, or in-

terest in or to said lands or the rents, profits, produce, and minerals arising out of or produced therefrom.

The entry is, *Decree reversed and cause remanded. Let a new decree be entered in accordance with the views herein expressed.*